[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Pickens,* Slip Opinion No. 2014-Ohio-5445.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-5445

THE STATE OF OHIO, APPELLEE, *v.* PICKENS, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Pickens,* Slip Opinion No. 2014-Ohio-5445.]

*Criminal law—Aggravated murder—Death penalty affirmed.*

(No. 2010-1406—Submitted August 19, 2014—Decided December 16, 2014.)

APPEAL from the Court of Common Pleas of Hamilton County,

No. B-0905088.

_____

PFEIFER, J.

{¶ 1} This is an appeal of right by defendant-appellant, Mark Pickens, who was convicted of the aggravated murders of Noelle Washington, her nine-month-old son, Anthony Jones III, and three-year-old Sha'railyn Wright.  A jury recommended the death sentence for the three murders, and the trial court sentenced Pickens to death.

{¶ 2} For the following reasons, we affirm Pickens's convictions and sentence of death.

## I. Trial Evidence

{¶ 3} Evidence introduced at trial showed that Pickens shot and killed Noelle and the two children in Noelle's Cincinnati apartment after Noelle reported to the police that Pickens had raped her two days earlier.

### A. Noelle's and Pickens's relationship

{¶ 4} Noelle and Pickens began dating in February 2009. Noelle was planning, however, to end their relationship and move to Nashville, Tennessee, to live with her sister, Tamika Washington.

### B. The rape

{¶ 5} Around 10:30 a.m. on May 31, 2009, Noelle went to Pickens's residence at Gateway Plaza Apartments in Cincinnati. About an hour and a half later, Noelle stumbled into the hallway, apparently pushed out, her pants below her hips. Noelle went to a neighboring apartment, pounded on the door, and screamed for help.

{¶ 6} Darlene Tucker lived in that apartment. Tucker testified that Noelle beat on her door, screaming, "[P]lease, help me, let me in before he gets me." Tucker opened the door and let Noelle inside. Noelle was hysterical and said that her boyfriend had a gun and had raped her. Tucker said that Noelle's hair was messy, she was sweating profusely, and she kept pulling up her pants around the waist. At Noelle's behest, Tucker called 9-1-1.

{¶ 7} At 12:30 p.m., Officer Marian Jenkins of the Cincinnati police met with Noelle at Tucker's apartment. Noelle said that she had been raped by Mark Pickens and described what happened. Noelle said she had gone to Pickens's apartment to have sex with him. But when Pickens started acting "funny," she decided that she did not want to have sex. Noelle told Pickens, "[N]o, no, I am not staying. I don't want to." Noelle said that Pickens then pulled out a gun and laid it on the bed. Noelle said that they then had sex. Afterwards, Pickens left the

building but Noelle did not know where he went. Noelle was then transported to the police department.

{¶ 8} At 1:20 p.m. on May 31, Detectives Chris Schroder and Stephanie Broxterman conducted an audio-taped interview of Noelle. Noelle stated that she went to Pickens's apartment at his invitation. According to Noelle, they talked at first and then started wrestling around. But he started playing rough and she told him to stop. Noelle told Pickens that she was going to leave, and Pickens told her, "I was fixing to get some pussy." Noelle repeated that she "didn't want to do it" and wanted to leave. Pickens replied, "[Y]ou ain't about to leave. We about to do it." Noelle said that Pickens then took a gun out of the dresser drawer and placed it on top of the dresser. He then started taking off Noelle's clothes.

{¶ 9} Noelle stated that she told Pickens that she needed to use the bathroom. But Pickens followed Noelle there and forced her back into the bedroom. Pickens then resumed removing her clothes, got on top of her, and had vaginal sex with her. When they finished, Noelle said that Pickens "started hitting me around." With the gun in his hand, he told Noelle, "I am going to kill us both and take us out of our misery."

{¶ 10} When Noelle told Pickens that she was calling the police, Pickens tried to take her phone from her. He pulled her hair, choked her, and punched her until he got the phone. Pickens then pushed Noelle into the hallway and continued hitting her. Noelle said that she grabbed the phone from him, thinking that it was hers, but she later discovered that she had taken Pickens's phone.

{¶ 11} Noelle stated that she and Pickens had exchanged text messages since the rape. Noelle said that Pickens asked her why she had called the police and asked her if she was "going to try to set [him] up." Noelle also said that Pickens's mother had called her after the rape and told her that Pickens knew that Noelle had been with the police.

{¶ 12} During follow-up questioning, Noelle said that Pickens had hit her approximately 25 times and struck her in the face three times. Noelle said that she had been wearing only a t-shirt when she was pushed into the hallway, and she got dressed inside the neighbor's apartment.

{¶ 13} During the interview, Noelle agreed to call Pickens and confront him about the rape. During the recorded phone call, Noelle confronted Pickens and asked, "Why did you have sex with me when you know that I didn't want you to?" Pickens responded, "I didn't have sex with you." Despite continued accusations, Pickens said repeatedly that he had not had sex with Noelle or hit her. During the conversation, Pickens said, "You * * * put a warrant out on me." Noelle replied, "No, they wanted me to talk to them but I didn't. I love you." But Pickens said, "You was talking to them. You told them everything."

{¶ 14} Following the police interview, Noelle went to the hospital for a rape exam. Kathleen Ferrara, a sexual-assault nurse examiner, examined Noelle. Noelle told Ferrara that she went to Pickens's apartment because he owed her money. Noelle said that Pickens started playing rough and insisted on having sex. Noelle told him that she did not want to have sex, and he started hitting and choking her. Noelle said, "I closed my legs together, but he pried them open. I was crying, telling him to stop." He then started "doing it" to her.

{¶ 15} Ferrara's examination showed that Noelle's lip was swollen and she had a bite mark on the right upper lip. There were also lacerations on her neck that were consistent with scratching. Ferrara also observed a laceration and bite mark on Noelle's chest, a laceration on her shoulder, a bite mark on her right thigh, and bruises on her left inner calf and left knee. Ferrara testified that these were fresh injuries that were consistent with Noelle's statement that Pickens had pried her legs open. Noelle suffered a laceration to her right inner labia that was approximately three centimeters long and a laceration to the left inner labia that

was approximately two centimeters in length. Ferrara testified that these injuries were "consistent with someone that is not * * * having consensual sex."

{¶ 16} At 10:44 a.m. on June 1, 2009, Schroder and Broxterman went to Pickens's apartment to question him. Schroder knocked on Pickens's door and received no answer. Schroder then wrote "please call me" on the back of a business card and left the card in the door.

*C. Events between Noelle's rape and her murder*

{¶ 17} Crystal Lewis, Noelle's friend and Sha'railyn Wright's mother, testified that on the afternoon of May 31, she talked to Noelle on the phone. Noelle said that she was at the hospital because "Mark raped me" and "hit me" and left "marks and bruises all over my body." Noelle also thought that Pickens had her house keys because she left them at his apartment.

{¶ 18} Gwendolyn Washington, Noelle's mother, testified that on the afternoon of May 31, she was with her son, Derrick Lee. During that time, she received a text message from Noelle's phone stating, "This MARK I DO NOT WANNA BE WIT YO DAUGHTER." Derrick testified that on that same afternoon, Noelle called him. Noelle was crying and kept repeating that "he raped me." Noelle also talked to her mother and told her that Pickens had raped her and that she was at the hospital.

{¶ 19} Tamika Washington, Noelle's sister, testified that on May 31, Noelle called screaming, "[H]e beat me up, he beat me up," and hung up. Tamika then called Noelle's phone number, and a male answered. He stated, "You fat bitch, quit calling the phone," and hung up. At that point, Tamika started sending text messages to that phone number. Tamika testified that one of the return text messages stated, "Noelle was only good for sucking his dick, he didn't care about her, the only thing she did after he hurt her feelings she would run to me and cry to me." Tamika then called him and said, "You are going to jail, you are going to

jail." He responded, "That's okay, because if I go to jail, then I am going to fuck her up." He then hung up.

{¶ 20} Jonda Palmer, a girlfriend of Pickens, testified that around 5:00 p.m. on May 31, Pickens came to her home. Pickens said that someone had accused him of rape, and he was angry. Pickens then asked Palmer if she would join with some other girls to beat up his accuser. Palmer refused. Palmer testified that when she gave Pickens a hug, she felt an object around his waist. She lifted up his shirt and saw a gun in his waistband. Palmer testified that after he left, they exchanged text messages, and Pickens said, "I feel like killing someone."

*D. Noelle, Sha'railyn, and Anthony murdered*

{¶ 21} Tanisha Scott, Noelle's cousin, testified that on the afternoon of June 1, 2009, she went to Noelle's home, and Noelle, Anthony, and Sha'railyn were there. Noelle told Tanisha that Pickens had raped her and that she was afraid of him. She could not find her keys and said that Pickens had them. Tanisha left around 8:00 or 9:00 p.m.

{¶ 22} Ronell Harris, an acquaintance of Noelle, testified that at 11:40 p.m. on June 1, he saw Noelle talking to a man outside the building where she lived. Harris asked Noelle if everything was all right, because he had never seen Noelle outside so late. Noelle said everything was fine. Harris also asked where her children were, and she said that they were upstairs. Before leaving, Harris told Noelle, "[I]f you need me, just call me." Harris testified that he later saw Pickens's photo on TV and recognized him as the man who had been talking to Noelle.

{¶ 23} Cynthia Evans testified that on the evening of June 1, she was visiting a friend outside a church across the street from Noelle's apartment building. Evans stated that she saw a woman with a baby arguing with a man across the street. Although Evans could not hear their conversation, she saw that the woman was crying and wiping her eyes, and the man was animated and

looked mad. Evans saw them enter the apartment building. Evans testified that she heard loud music and later heard "two pops; boom, boom" and then "another pop, pop." She then heard "another pop, pop," and her friend said, "that's gunfire, Cindy." Evans stated that the music stopped, and it became quiet.

{¶ 24} Evans testified that shortly thereafter, a woman came down the street and entered the apartment. She then came outside and screamed, "[M]y baby, my baby." Evans asked the woman what was the matter, and she said that her baby was not breathing. Evans called 9-1-1, entered the apartment, and found that Noelle and the two children were dead.

{¶ 25} Police spoke to Lewis about the events of that evening. Lewis testified that Sha'railyn stayed at Noelle's home. At 11:12 p.m., Noelle texted her, saying, "Bitch I jus woke up mark was comin thru the kitchen." Lewis texted back, "Wher he at now[?]" At 11:37 p.m., Noelle texted, "He gone." At 11:40 p.m., Lewis texted, "I am about to come get her i am worry." Noelle replied, "I'm finn go back to sleep." At 11:42 p.m., Lewis texted, "Na i dont want her to be in da middle of that." Noelle replied, "Of wat. He gone." At 11:44 p.m., Lewis texted, "i dont give a fuck if he is gone he can come right back n yall don't need to be there." At 11:48 p.m., Lewis texted, "On my way now." At 11:49 p.m. Noelle texted, "K." This was the last text message Lewis received from Noelle.

{¶ 26} Lewis testified that she arrived at Noelle's building about five or ten minutes after leaving home. Lewis entered the building and found Noelle's door halfway open. Lewis went inside Noelle's apartment and found Noelle sitting on the couch with Anthony in her arms and a cell phone in her hand. They were both dead. When she saw her daughter on the floor, Lewis ran outside, screaming, "He killed my baby. My baby's dead."

{¶ 27} At 12:15 a.m. on June 2, Cincinnati police officers arrived at Noelle's apartment. Noelle was found slumped over on the couch with a baby in her arms and a cell phone in her hand. Sha'railyn was found lying near the TV in

the same room. All three victims had been shot in the head and were pronounced dead.

## E. Murder investigation begins

{¶ 28} At 12:30 a.m. on June 2, Detective Greg Gehring examined the crime scene. Investigators found no signs of forced entry, though a window was partly open in the front of the building. No firearms were found inside the apartment or in the area around the apartment building. Noelle's keys were not in the apartment.

{¶ 29} Gehring learned that Noelle had filed charges against Pickens for rape on May 31 and was informed about the text messages that Noelle had sent before she was killed. Based on this information, Pickens was identified as the murder suspect. At approximately 3:45 a.m. on June 2, the police arrested Pickens at his apartment and took him to the station. In the meantime, Gehring watched surveillance footage from Gateway Plaza showing Pickens's arrivals and departures during the previous night.

## F. Pickens's police interview

{¶ 30} Gehring testified that at 10:30 a.m. on June 2, Pickens waived his *Miranda* rights and was interviewed. Initially, Pickens stated that he did not remember what he did on May 31. Later, he stated that he "had got into it" with Noelle on Saturday or Sunday. Pickens said that Noelle came over to his place and they started playing rough. She then took his phone and ran out of the house. Pickens said that that was the last time he saw Noelle.

{¶ 31} Pickens said that Noelle sent him a text after she left his apartment and told him that she had called the police because he took her phone and "pulled her hair and stuff." Pickens stated that he had not hit her, pulled her hair, or punched her. He also denied having sex with Noelle on Saturday or Sunday. Pickens said, "I ain't had sex with her since earlier in that week * * *."

{¶ 32} As for June 1, Pickens said that he was at his mother's home all day, until 8:00 or 9:00 p.m. He then went straight home. Pickens said that he did not leave his apartment for the rest of the evening and went to bed around midnight. He denied going to Noelle's apartment on June 1 and said that he had not been to her home for about a month. Later, Pickens said that he had not been to Noelle's place for nine months.

{¶ 33} Pickens denied killing Noelle. When he was informed that other people had seen him at her place, Pickens said, "Ain't nobody seen me over her house. I was not over there." When informed that surveillance video showed him leaving his apartment and later returning, Pickens responded, "I did not leave." Pickens also denied owning a firearm or ammunition. When informed that the police had found ammunition in his closet, Pickens replied, "You all ain't found no bullets in my apartment."

{¶ 34} Gehring also informed Pickens that the police were looking for him because of the rape charge. Pickens said that he did not know that the police were looking for him until he saw the card in his door the previous night. Pickens did not know what the police wanted to talk to him about. He said he was going to call the police later that day.

*G. Surveillance videos and travel times*

{¶ 35} During trial, the state presented surveillance video taken in the hallway outside Pickens's apartment on May 31. The video showed that at 10:38 a.m., Noelle entered Pickens's apartment. At 12:18 p.m., Noelle came out of the apartment, pulling up the waist of her pants. Noelle knocked on the neighbor's door, and Tucker opened the door and talked to her. At 12:19 p.m., Noelle returned to Pickens's apartment, knocked on the door, and Pickens came into the hallway. Noelle reached into Pickens's back pocket, and they began to struggle on the hallway floor. Noelle then returned to Tucker's apartment and Pickens departed. At 12:20 p.m., Pickens returned to his apartment. At 12:29 p.m., two

Cincinnati police officers arrived on the scene and talked to Noelle. They also knocked on Pickens's door, but he did not answer. At 12:46 p.m., Noelle left with the police.

{¶ 36} The state also presented surveillance videos taken outside Pickens's apartment and other locations at Gateway Plaza on June 1 and 2. The video showed Pickens leaving his apartment at 7:33 a.m. on June 1. At 10:44 a.m., Schroder and Broxterman arrived at Pickens's apartment. Schroder knocked on the door and left his card. At 10:32 p.m., Pickens returned to his apartment and took the card from his door. At 10:37 p.m., Pickens left his apartment with his bicycle while wearing a jacket that was later found to have gunshot residue on it. The outside video showed that at 12:04 a.m. on June 2, Pickens returned to Gateway Plaza on his bicycle. But the hallway video showed Pickens returning with his bicycle to his apartment at 11:58 p.m. This discrepancy was explained by Gehring, who testified that the timer on the outside video was five minutes fast and the hallway video was two minutes slow.

{¶ 37} During trial, Officer Tim Watson, a Cincinnati bicycle policeman, testified that he measured the time it took to ride a bicycle on three different routes between Gateway Plaza and Noelle's home. He took the trips between 10:00 and 11:30 p.m. on three different evenings. He stated that the fastest trip took three minutes and 20 seconds, and the slowest trip took four minutes.

*H. Forensic evidence*

{¶ 38} Andrew Burger, a criminalist with the Cincinnati Police Department, recovered three .45-caliber shell casings and a projectile from Noelle's apartment. The apartment had not been ransacked and there were no indications of a struggle. One of the outside windows was slightly open, and "it looked like someone had tried to push it up from the outside." Burger saw finger marks on the window and dusted for fingerprints. He was unable to develop any usable prints.

{¶ 39} Barbara Mirlenbrink, a criminalist with the Cincinnati Police Department, testified that she collected evidence from Pickens's apartment. She found a box containing 43 rounds of .45-caliber ammunition in Pickens's closet and various items in a garbage can, including two pairs of baby socks, a baby toy, a gold earring, a social security card for Anthony Jones III, and a National City debit card in Noelle's name. An Ohio Direction Card in Noelle's name was also found on the bedroom dresser and a bicycle and a jacket on Pickens's patio. Mirlenbrink testified that the upper portion of the jacket was completely dry but the sleeves were wet "like it had been dipped." Mirlenbrink tested the bicycle for gunshot residue.

{¶ 40} Michael Trimpe, a forensic scientist at the Hamilton County coroner's crime laboratory, testified that he tested lifts taken from the bicycle frame, the bicycle seat, the handlebars, and the handles. Those tests revealed the presence of particles from detonated primer of a discharged firearm. Trimpe testified that "the presence of primer residue on an item is consistent with that item at some time in its history having been in the vicinity of a firearm when it was discharged or having come into contact with primer residue on another item." Trimpe also took lifts from the cuffs and sleeves of the jacket, which tested positive for the presence of gunshot residue.

{¶ 41} John Heile, a firearms and toolmark examiner for the Hamilton County coroner's crime laboratory, examined the three Federal .45-caliber automatic cartridge cases found at the murder scene. He testified that the three cartridge cases were all fired from the same weapon. Heile stated that they could have been fired from "a Colt, a Kimber or a U.S. military type 45 * * * caliber semi-automatic pistol." Heile also found severe "chamber marks" on the cartridge cases, which indicated that a defect could have hindered the cartridge from properly entering the chamber. Heile said that this might have caused the weapon to jam before each shot was fired.

**{¶ 42}** Heile examined the two autopsy bullets and the bullet found at the scene. He testified that they were .45-caliber automatic hollow-point bullets, and they were all fired from the same weapon. The ammunition found in Pickens's closet was also examined, and these were Winchester .45-caliber automatic hollow-point bullets. Heile testified that this ammunition was compatible with the weapon that fired the autopsy bullets.

**{¶ 43}** William Harry, a forensic scientist with the Hamilton County coroner's crime laboratory, testified that he identified semen on the vaginal swab collected from Noelle. He testified that DNA extracted from the swab matched the DNA profile of Pickens. Harry stated that this profile "would be expected to occur in approximately one in one sextillion nine hundred seventeen quintillion individuals."

*I. Autopsy results*

**{¶ 44}** Dr. William Ralston, chief deputy coroner for Hamilton County, conducted the autopsy of the three victims. He testified that Noelle died from a single gunshot wound to the back of the head. He stated that toxicology testing was negative for the presence of alcohol or drugs. Dr. Ralston testified that Anthony Jones died from a gunshot wound to his forehead. Dr. Ralston identified soot and stippling around the entrance wound, which he said shows that this was a close-range shot fired from a distance of 6 to 12 inches.

**{¶ 45}** Dr. Ralston testified that Sha'railyn Wright died from a gunshot wound on the left side of her head behind the ear. There was also a gunshot injury to the left first finger and the left middle finger. He testified that these wounds may have occurred while Sha'railyn was covering her head with her hands. Dr. Ralston also testified that he detected stippling and soot on the fingers, which indicated that the firearm was fired at a range of 6 to 12 inches from Sha'railyn's head.

*J. Informant's testimony*

{¶ 46} Montez Lee testified that he and Pickens were housed in the same cell block. Lee stated that Pickens told him, "I killed that bitch and the babies." Pickens told him that he had killed Noelle because "the girl kept calling the police on him." Pickens said that he shot Noelle in the head with a .45 automatic with hollow-tip bullets. Pickens also said that the police found some .45-caliber ammunition in his house, but it was not the same kind of ammunition that he had in his gun. Pickens said that he killed the three-year-old child because she knew him and could identify him and that he shot the baby "[b]ecause the baby was just there, like he got a rush out of it."

*K. Defense evidence*

{¶ 47} The defense called no witnesses during the trial phase but presented several exhibits. The evidence included three grand-jury indictments brought against Lee before he agreed to testify against Pickens: an indictment for aggravated robbery, robbery, and felonious assault, an indictment for robbery, and an indictment for aggravated murder, murder, aggravated robbery, robbery, and having weapons while under a disability.

{¶ 48} The trial court also admitted Lee's plea agreement, in which Lee agreed to testify against Pickens in exchange for the state's agreement to accept Lee's guilty plea to one count of voluntary manslaughter with a firearm specification. The state also accepted an agreed prison sentence of 13 years and agreed to dismiss the remaining counts and specifications in the indictments.

{¶ 49} The trial court also admitted a handwritten letter that Lee sent to Pickens asking him for $300 in exchange for Lee's agreement not to testify.

{¶ 50} In addition, the trial court admitted a complaint for a theft offense filed against Ronnell Harris that was presented to impeach Harris during his testimony.

## II. Case history

{¶ 51} The state charged Pickens with three counts of aggravated murder. Count Two charged him with the aggravated murder of Noelle with prior calculation and design and contained death-penalty specifications for murder to escape accountability for a crime, R.C. 2929.04(A)(3), and for murder as part of a course of conduct involving multiple murders, R.C. 2929.04(A)(5). Count Three charged him with the aggravated murder of Sha'railyn, a child under the age of 13. Count Four charged him with the aggravated murder of Anthony, a child under the age of 13. Counts Three and Four contained death-penalty specifications for a course of conduct, R.C. 2929.04(A)(5), and for the murder of a child under the age of 13, R.C. 2929.04(A)(9). All three counts contained firearm specifications.

{¶ 52} Pickens was also charged with three additional counts. Count One charged him with the rape of Noelle. Counts Five and Six charged him with having a weapon under a disability.

{¶ 53} Pickens pled not guilty.

{¶ 54} The jury found Pickens guilty of all charges and specifications and recommended that he be sentenced to death. The trial court accepted the jury's recommendation and sentenced Pickens to death on all three counts of murder. Prior to sentencing on the noncapital offenses, the trial court merged Counts Five and Six and merged the three gun specifications. The trial court sentenced Pickens to ten years for rape, five years for having a weapon under a disability, and three years on the firearm specification.

## III. Issues on Appeal

{¶ 55} In this appeal, Pickens raises ten propositions of law. These issues will be addressed in the approximate order that they arose during the trial.

*A. Pretrial and trial issues*

1. *Voir dire on defendant's youth* (Proposition of law I)

**{¶ 56}** Pickens argues that the trial court erred by allowing the prosecutor to ask prospective jurors during voir dire about his youth as a mitigating factor. During voir dire of the first group of prospective jurors, the prosecutor made the following comments:

> As far as Mr. Pickens goes, my understanding is he's around 20 years old or so now, and that he may have been around 19 or so around the time of these crimes. Do any of you feel because of his age –
>
> Mr. Ancona [defense counsel]: Objection. Can we approach your honor?
>
> The Court: Sure.

**{¶ 57}** Counsel argued that the "prosecution can't put into the record a mitigating factor." The trial court replied, "You stopped them before they actually got to it." Counsel moved for a mistrial and added, "[B]ut if the Court does not grant a mistrial, the Court would instruct to disregard would be all right." The trial court sustained the defense objection and overruled the motion for a mistrial. The trial court also instructed the prosecutor to "[s]tay away from mitigating factors" and to "move on to something else."

**{¶ 58}** Pickens invokes *State v. Wilson*, 74 Ohio St.3d 381, 659 N.E.2d 292 (1996), and *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4386, 873 N.E.2d 828, in arguing that a mistrial should have been declared, because the prosecutor improperly mentioned his youth as a mitigating factor during voir dire. In *Wilson*, the defense argued that *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), allowed counsel to ask prospective jurors what they thought

about each of the statutory mitigating factors. *Wilson* at 385-386. *Morgan* held that the trial court, at an accused's request, must ask prospective jurors about their views on capital punishment to ascertain whether any of them would automatically vote for the death penalty regardless of the circumstances. *Id*. at 735-736. In rejecting defense arguments, *Wilson* held that "*Morgan* does not require judges to allow individual voir dire on separate mitigating factors." *Wilson* at 386. *Wilson* stated that the "detailed questioning that occurred in this case was adequate to expose faults that would render a juror ineligible. * * * *Morgan* imposes no further requirements on voir dire." *Id*.

{¶ 59} In *Mundt*, the defense argued on appeal that trial counsel were ineffective by failing to question a prospective juror about specific mitigating factors. In rejecting this claim, the court cited *Wilson* and simply noted that "the parties are not entitled to ask about specific mitigating factors during voir dire." *Mundt* at ¶ 84.

{¶ 60} We have repeatedly held that a trial court is under no obligation to allow counsel to question prospective jurors about specific mitigating factors. *See, e.g., State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 24; *Wilson; see State v. Jones*, 91 Ohio St.3d 335, 338, 744 N.E.2d 163 (2001). Neither the prosecutor nor defense counsel, however, is prohibited from mentioning or asking questions about specific mitigating factors. *See State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, ¶ 131 (court may allow counsel to refer to specific mitigating evidence as examples of mitigating factors during voir dire). The matter is one for the trial court's discretion. In any event, the trial court sustained an objection to the prosecutor's comment about Pickens's youth before the prosecutor could pose a question to the jury. Thus, no error occurred.

{¶ 61} Based on the foregoing, we reject proposition I.

2. Batson *challenges* (Proposition of law II)

**{¶ 62}** Pickens argues that the prosecutor peremptorily challenged three African-American prospective jurors because of their race, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

a. The *Batson* standard

**{¶ 63}** In *Batson*, the United States Supreme Court held that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of its peremptory challenges to exclude prospective jurors solely on account of their race. *Id*. at 89. A court adjudicates a *Batson* claim in three steps. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 61. First, the defendant must make a prima facie case of racial discrimination. *Batson* at 96-97. Second, if the defendant satisfies that burden, the prosecution must provide a racially neutral explanation for the challenge. *Id.* at 97-98. Third, the trial court must decide, based on all the circumstances, whether the defendant has proved purposeful racial discrimination. *Id*. at 98. At this stage, the court "must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 65. The judge must "assess the plausibility" of the prosecutor's reason for striking the juror "in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005).

**{¶ 64}** A trial court's finding of no discriminatory intent will not be reversed on appeal unless clearly erroneous. *Frazier* at ¶ 64; *see Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). If a trial court does err in applying *Batson*, the error is structural. *United States v. McFerron*, 163 F.3d 952, 956 (6th Cir.1998).

b. Prospective juror Hemphill

{¶ 65} On her jury questionnaire, Hemphill answered the question, "Please describe your views on the death penalty," as follows:

Mixed:    If someone commits murder should they experience to appreciate the extent of their crime?
*or*
If murder is so horrible and final should we go there when we have alternatives for punishment?

{¶ 66} Hemphill also stated that she had received a J.D. degree from Northern Kentucky University but decided not to practice law. She added, "Night school paid by employer, Cincinnati Bell. After working with corporate legal departments, I decided that I did not want to have to argue or *win* for a living." (Underlining sic.)

{¶ 67} During voir dire, the prosecutor asked Hemphill for her views on the death penalty:

Mr. Tieger [the prosecutor]:    * * * As far as the death penalty, can you tell me what your views on the death penalty are?

Prospective juror 2:  They're mixed. I haven't resolved it one way or the other, and I said that on my application.

Mr. Tieger:  I'm sure you thought about it a lot over the weekend?

Prospective juror 2:  No, I didn't.

Mr. Tieger:  Just when you got here today?

Prospective juror 2:  I tried to be Scarlett O'Hara on difficult topics.

18

Mr. Tieger:  Tell me about the mixed feelings you have.

Prospective juror 2:  Well, on the one hand, if someone takes a life or takes several lives, why should they be able to enjoy their life?  Then on the other hand, if it's such a heinous crime, one that we have very strong penalties for, then why would we use that as a solution when there are other alternatives, so I'm constantly going back and forth.

Mr. Tieger:  Correct me if I'm wrong, that one of your thoughts is that life in prison is a worse penalty than the death penalty because they will have time to reflect on what they did?

Prospective juror 2:  I don't know if it's worse.  It's an alternative.

Mr. Tieger:  I'm just reading your form:  If someone commits murder, should they experience to appreciate the extent of their crime, or if murder is so horrible and violent, should we go there when we have alternatives for punishment?

On the one hand, if it's so bad maybe the death penalty is appropriate, and the other, they should have to just sit in jail for the rest of their lives as well.

Prospective juror 2:  I don't know.  It would depend on the circumstance.  I'm just saying if you ask me how I feel about the death penalty, I play devil's advocate with myself and say on the one hand, what's the ultimate punishment?  On the other hand, what do we as a society want to say about ourselves, and so how you reconcile that, or can you ever reconcile that?

Mr. Tieger:  What I'm asking you, can you reconcile that within yourself in terms of this particular case?

Prospective Juror 2: As far as the case, once I hear the case, then I will be able to do that versus the general question of whether there should be the death penalty.

* * *

Mr. Tieger: What I'm asking, kind of the round about way, can you follow the law that Judge Martin gives you?

Prospective Juror 2: I prefer to follow the law, that way it's less off me, if you see what I'm saying.

Mr. Tieger: Right. But what I'm saying is the law at some point it doesn't give you a choice, so to speak, that if you find these aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, what Judge Martin will tell you is that the jury shall impose the death penalty, you have no trouble with that law at all?

Prospective Juror 2: No.

Mr. Tieger: Even though you have mixed feelings now?

Prospective Juror 2: I have mixed feelings about the general question of the death penalty. If I'm given a specific case with specific instructions and specific evidence, then that's what I will follow.

{¶ 68} The prosecutor peremptorily challenged Hemphill, and trial counsel objected that this was a *Batson* violation.

{¶ 69} The state offered two race-neutral explanations for excusing this juror. First, the prosecutor explained:

If you look at her answer on the death penalty, it is extremely confusing and hard to understand. She says, mixed. If someone

20

commits murder, should they experience to appreciate the extent of their crime, question mark, which doesn't make sense. Then she says or, and underlines or, if murder is so horrible and final, should we go there when we have alternatives for punishment, and has a question mark there. I think that's a very ambivalent answer. It is very anti death penalty.

{¶ 70} Second, the prosecutor pointed to Hemphill's comments on the questionnaire about her law degree:

On questions number 28, she does have a JD, and it looks like she went all the way through law school, and then there is an asterisk at the bottom of her form, night school paid by employer. After working with corporate legal department, I did not want to argue or win, which she underlines, for a living, which is very odd to go through that type of school and at the end, decide she didn't want to finish it out.

{¶ 71} Trial counsel challenged the state's explanation and asserted, "She cleaned up her answers extremely well in Voir Dire. Said she could follow the law." The trial court rejected the *Batson* challenge and found that "the State has given a race neutral reason for excusing her and she will be excused * * *."

{¶ 72} Pickens argues that the state did not provide a race-neutral explanation for the peremptory challenge of Hemphill. Pickens contends that Hemphill's answers during voir dire were "perfectly appropriate," and "in light of all the circumstances," the state had an obvious discriminatory motive for removing Hemphill from the jury.

**{¶ 73}** Hemphill's answers about the death penalty on her questionnaire and during voir dire conveyed uncertainty about her views on the death penalty. Hemphill acknowledged that her views about the death penalty were "mixed" and stated that "I haven't resolved it one way or the other * * *." Hemphill's equivocal answers about the death penalty show that the prosecutor's race-neutral justification for striking Hemphill was not pretextual. *See Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 70 (prospective juror's uncertainty about the death penalty accepted as a race-neutral explanation for challenge).

**{¶ 74}** Moreover, a review of the voir dire examination of the seated jurors supports the plausibility of the prosecution's reason for striking Hemphill for her views on the death penalty. *See Miller-El v. Dretke*, 545 U.S. at 241-242, 125 S.Ct. 2317, 162 L.Ed.2d 196 (evidence of purposeful discrimination may be found if reason for challenge to African-American is equally applicable to otherwise similar non-African-American who is permitted to serve). The questionnaires and the voir dire testimony of the ten seated Caucasian jurors show that none of them expressed a level of uncertainty about the death penalty equal to that conveyed by Hemphill. Viewed as *Miller-El* directs, the record does not support Pickens's claim that the prosecution's race-neutral reason for striking Hemphill was pretextual.

**{¶ 75}** The state's second race-neutral justification was based on Hemphill's employment status. Peremptory challenges may be validly exercised on the basis of employment status and occupation. *See United States v. Simon*, 422 Fed.Appx. 489, 494 (6th Cir.2011); *State v. O'Neal*, 87 Ohio St.3d 402, 409, 721 N.E.2d 73 (2000) (challenge to social worker on grounds that occupation was not "pro-conviction" deemed race neutral). The state's explanation was that Hemphill failed to become a lawyer after she graduated from law school that her employer had paid for.

22

**{¶ 76}** But juror McCune, a Caucasian male, was a lawyer and was not challenged. Nevertheless, the record shows that there were meaningful differences between Hemphill and McCune. McCune had worked in several different legal positions during his career and was currently employed as a lawyer. Hemphill had gone to law school but had not pursued a legal career, because she "decided that [she] did not want to have to argue or *win* for a living." (Underlining sic.) Thus, their similarity (i.e., they both went to law school) was marginal at best. Thus, the record again fails to support Pickens's claim that the proffered race-neutral justification was pretextual.

c. Prospective juror Hutchinson

**{¶ 77}** On his questionnaire, Hutchinson answered the question, "Please describe your views on the death penalty" as follows: "If its proven beyond a shadow of dought [sic] im [sic] for it, such as they confess to the crime."

**{¶ 78}** During voir dire, the prosecutor asked Hutchinson about his comments on the questionnaire about the death penalty and the burden of proof:

Mr. Tieger: As far as the death penalty, tell me your views on the death penalty.

Prospective juror Hutchinson: I believe in the death penalty, if the evidence points to that. Like I wrote on my questionnaire, has to be beyond a shadow of a doubt.

Mr. Tieger: When I was talking to the jury yesterday, I mentioned the words, shadow of a doubt. That's not a legal term at all. It is beyond a reasonable doubt. Are you good with that?

Prospective juror Hutchinson: Yes.

Mr. Tieger: You put on your form if it is proven beyond a shadow of a doubt; I am for it, such as, they confess to the crime. In this particular case, he did not confess to the crime.

Prospective juror Hutchinson: If the evidence points to that.

* * *

Mr. Tieger: Okay. You also marked on your form that you are opposed, with very few exceptions. Can you talk about that a little bit?

Prospective juror Hutchinson: The death penalty?

Mr. Tieger: Your feelings on the death penalty.

Prospective juror Hutchinson: I believe in the death penalty, if the evidence points towards that. That's it.

{¶ 79} Hutchinson was also asked about his answer on the questionnaire that he had encountered "a negative or a frightening experience with a person of another race" whenever he had been pulled over by a white police officer. Hutchinson said, "This was in the past when I was pulled over by a white cop, they expressed how they was feeling at that time, either calling me boy, detaining me, talking to me like I was trash."

{¶ 80} The prosecutor peremptorily challenged Hutchinson. The defense objected to this challenge as a *Batson* violation, stating: "He answered his questions correctly. He is strong on pro death penalty. We believe there is * * * [a]n irrational inference in dismissing him."

{¶ 81} The prosecutor provided three race-neutral justifications for challenging Hutchinson. First, the prosecutor stated:

If you look at his questionnaire in response to question 51 on the death penalty, he says, proof beyond a shadow of a doubt, which is an incorrect standard, such as they confess to the crime.

24

So he is looking for something like a confession, which we don't have in this case * * *.

{¶ 82} Second, the prosecutor stated that Hutchinson said on his questionnaire that he was "opposed with very few exceptions to the death penalty." Third, the prosecutor described Hutchinson's statement about his negative experiences with white police officers as "troubling to us also in that there are a number of white police officers that are going to testify. He comes in with that predisposition. I think he will have a problem being fair and impartial."

{¶ 83} The trial court rejected the *Batson* challenge and made the following findings:

I am going to excuse him. I think the shadow of a doubt comment is a problem even if he did straighten it out. The confession issue is a problem, even if he did address it. The risk is he would try to introduce another element to the offense. The issues concerning his prior problems with white police officers. I do not find it be a legitimate reason to kick somebody off because he says he is opposed with very few exceptions. That's the law. Very few homicides ever get prosecuted for the death penalty. On that basis, it wouldn't be enough. The state cited more than ample race neutral reasons to dismiss Mr. Hutchinson.

{¶ 84} Pickens argues that the state failed to provide a reasonable race-neutral explanation for peremptorily challenging Hutchinson. The trial court accepted the state's justification for excusing Hutchinson because he stated that he supported the death penalty if it is proven beyond a shadow of doubt, when, for example, there is a confession. This was a race-neutral explanation.

Hutchinson's statement, even as clarified at voir dire, indicated that he might hold the state to a higher burden of proof than "beyond a reasonable doubt." Moreover, Hutchinson's statement about confessions indicated that he might hold the state to a higher evidentiary standard than required by law. *See State v. Wright*, 7th Dist. Mahoning No. 03 MA 112, 2004-Ohio-6802, ¶ 18 (prosecutor's peremptory strike of juror who believed that state had to prove its case beyond a shadow of a doubt was race neutral); *United States v. Leonard*, 356 Fed.Appx. 231, 234-236 (11th Cir.2009) (prosecutor's peremptory strike was race-neutral where juror said she might require the government to prove guilt by a burden of proof higher than the "beyond the reasonable doubt" standard). Thus, we hold that Hutchinson's excusal was not a *Batson* violation.

### d. Prospective juror Bell

{¶ 85} During voir dire, the prosecutor questioned Bell about her views on the death penalty. Bell stated that her views had "evolved some the past couple days." Bell stated she had a Baptist background and "wanted to make sure that if I had to [apply] it, * * * it would be the right thing to do." Bell said she "looked up some scriptures and reflected on being a citizen, just being a good citizen and following law." Bell also talked to one of the ministers at her church about the death penalty. Bell stated that the minister told her, "Just to look in certain scriptures and that it was okay. It wasn't one of those things where we weren't completely against it."

{¶ 86} Bell was also asked about her answer on the questionnaire about police investigations. On her questionnaire, Bell stated: "I feel like crime scenes are often contaminated, and precious evidence is either destroyed or overlooked. They need to make closer connections w/the investigations." During voir dire, Bell related this answer to "a couple of incidences at our school where I think it took the police too long to get there."

**{¶ 87}** The prosecutor peremptorily challenged Bell, and trial counsel objected that this was a *Batson* violation.  The prosecutor offered the following race-neutral explanation:

> It was troubling to me that she indicated to everybody here that after she was told not to discuss the case with anybody, she talked to somebody with her church as far as whether it is the right thing to do or not or whether or it is a law or rule she could follow.  She has somewhat violated the rule the Court gave her in discussing the case with somebody else.

**{¶ 88}** As an additional reason, the prosecutor mentioned Bell's comments about contaminated crime scenes.  The prosecutor argued that her predisposition put an unfair burden on the state with respect to the crime scene.  The prosecutor mentioned that this juror indicated on her questionnaire that she watched "CSI, Law & Order, Criminal Minds, Cold Case, 48 Hours, [and] Unsolved Mysteries."

**{¶ 89}** Trial counsel challenged the state's explanation.  He argued that if the prosecutor thought that the juror had violated the trial court's instructions, he should have challenged her for cause.

**{¶ 90}** The trial court rejected the *Batson* challenge, stating, "The race neutral reason of her going and seeking independent counsel on the issue of [the] death penalty is sufficient to excuse her from the panel."   But the trial court rejected the prosecutor's explanation that Bell's comments about contaminated crime scenes and watching TV crime shows provided a legitimate race-neutral justification for excusing her.

**{¶ 91}** Pickens argues that the prosecutor failed to provide a reasonable race-neutral explanation to support the peremptory challenge.  Bell's discussion about the death penalty with her minister after she had been instructed not to

discuss the case with anyone else was a race-neutral justification. Moreover, trial counsel's argument that the prosecutor should have challenged Bell for cause has no merit because the " 'prosecutor's explanation [for a peremptory challenge] need not rise to the level justifying exercise of a challenge for cause.' " (Brackets sic.) *Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 97, quoting *Batson*, 476 U.S. at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69.

e. Pattern of excluding African-American jurors

{¶ 92} Pickens argues that the prosecutor's peremptory challenges of three African-American prospective jurors exhibited a pattern of excluding African-Americans from the jury. He presented no evidence, however, to support this claim. Moreover, the empanelled jury included two African-Americans, and two African-Americans served as alternate jurors. The state also did not use two peremptory challenges that were available before the jury was finally selected. The presence of African-Americans on a jury certainly does not preclude a finding of discrimination but " 'the fact may be taken into account * * * as one that suggests that the government did not seek to rid the jury of persons [of a particular] race.' " (Brackets and ellipsis sic.) *State v. White*, 85 Ohio St.3d 433, 438, 709 N.E.2d 140 (1999), quoting *United States v. Young-Bey*, 893 F.2d 178, 180 (8th Cir.1990). Absent evidence of a pattern of misconduct, we conclude that this claim lacks merit.

{¶ 93} Based on the foregoing, we reject proposition II.

3. *Prosecutorial misconduct* (Proposition of law III)

{¶ 94} Pickens argues that the state engaged in misconduct by failing to disclose discovery evidence in a timely manner and by failing to disclose *Brady* evidence. Pickens also argues that the prosecutor committed misconduct by making improper comments during its opening statement and closing argument.

a. Discovery and *Brady* requests

**{¶ 95}** Crim.R. 16(B), at the time of Pickens's trial, required the prosecutor to disclose certain information upon a proper discovery request made by the defendant. Crim.R. 16 was amended effective July 1, 2010, but during the trial, it stated:

> **(B) Disclosure of evidence by the prosecuting attorney**
>
> *(1) Information subject to disclosure*.
>
> \* \* \*
>
> (e) Witness names and addresses; record. Upon motion of the defendant, the court shall order the prosecuting attorney to furnish to the defendant a written list of the names and addresses of all witnesses whom the prosecuting attorney intends to call at trial, together with any record of prior felony convictions of any such witness, which record is within the knowledge of the prosecuting attorney.

**{¶ 96}** The prosecutor must also provide defendants any evidence that is favorable to them whenever that evidence is material either to their guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Evidence is considered material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

**{¶ 97}** Pickens argues that the prosecutor failed to provide discovery until the eve of trial or during trial and also failed to disclose *Brady* material in discovery. First, Pickens claims that the state failed to provide the defense with

the audio portion of the surveillance video taken in the hallway outside Pickens's apartment. This claim lacks merit because Layne Hurst, the property manager of Gateway Plaza Apartments, testified that the surveillance video did not include an audio recording.

{¶ 98} Second, Pickens argues that the state provided "late disclosure" to the defense of its intention to call Montez Lee as a prosecution witness. Pickens contends that he did not learn that Lee would testify until April 12, 2010, only three days before opening statements. The record shows, however, that the state informed the defense in a written discovery response on November 20, 2009, that Lee was going to be a witness. Moreover, during a status hearing on discovery on December 1, 2009, the prosecutor stated that "at some point in the trial, we are definitely going to call" Lee. Thus, this claim lacks merit.

{¶ 99} Third, Pickens makes the generalized claim that prosecution witnesses made inconsistent statements that contained obvious *Brady* material that were not disclosed. Pickens fails, however, to identify the witnesses or specify which statements were not disclosed. Rather, he cites the record of the proceedings on April 12, 2010, when the defense complained about late discovery. Counsel complained about the late disclosure of Noelle's inconsistent statements about her reasons for going to Pickens's apartment on the day of the rape. The prosecutor countered that Noelle's police statements had been provided to defense counsel.

{¶ 100} The prosecutor also reminded the court that during the Evid.R. 804(B)(6) hearing on March 19, 2010, Noelle's friends and relatives testified as to Noelle's different reasons for going to Pickens's apartment: Noelle told Officer Jenkins and Detective Schroder that she went to his apartment to have sex, she told her sister Tamika that she went to return something that she had taken from Pickens's car, she told her mother that she went to collect money that Pickens owed her, and she told her friend Crystal Lewis that she went there "so we could

talk." In addition, defense counsel had the statement that Noelle had written at the hospital for the rape examination, where she stated, "Mark owed me money so I went over to get it." Thus, the defense knew about Noelle's inconsistent statements before trial began, and no *Brady* violation occurred.

{¶ 101} Pickens complains that these *Brady* materials were provided on the eve of trial and were too late. As to late discovery, we have stated:

> [T]he philosophical underpinnings of *Brady* support the conclusion that even disclosure of potentially exculpatory evidence during trial may constitute a due process violation if the late timing of the disclosure significantly impairs the fairness of the trial. Even where information may be exculpatory, "[n]o due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial."

*State v. Iacona*, 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001), quoting *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir.1985).

{¶ 102} The defendant has the burden to prove a *Brady* violation rising to the level of a due-process violation. *Iacona* at 92. As an initial matter, it is not clear that the state provided late discovery about Noelle's statements. At the very least, the defense knew about Noelle's inconsistent statements nearly a month before trial began. Pickens also fails to explain how counsel were burdened in presenting his case by not learning about Noelle's inconsistent statements earlier.

{¶ 103} Moreover, the court asked trial counsel if they wanted a continuance to review witness statements and prepare for trial. Counsel responded, "I don't think we need it, but if we did, we would certainly tell you." "Hence, 'the trial court may have properly determined that appellant was prepared to proceed despite any claim of unfair "surprise." ' " *State v. Hale*, 119 Ohio

St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 119, quoting *State v. Bidinost*, 71 Ohio St.3d 449, 457, 644 N.E.2d 318 (1994); *see also Iacona* at 101.  Thus, Pickens has failed to establish that any delay in obtaining *Brady* materials or other discovery deprived him of due process.

{¶ 104} As a final matter, Pickens complains that Detective Gehring improperly talked to a witness during trial and then failed to promptly disclose the substance of the interview to the defense.  During the state's case-in-chief, the defense objected that Gehring, who was himself a witness, had violated the trial court's order for a separation of the witnesses when he spoke to Lee, who would later be testifying.  The prosecutor responded that Gehring was the state's "case agent" and was "[b]asically just sitting there while we talk."  The trial court agreed that Gehring should not be talking to the witnesses but stated, "I don't think there is any indication that there has been anything done wrong * * *."

{¶ 105} Trial counsel then expressed concern that Gehring and other officers were obtaining information about a woman named Star Christ.  According to Montez Lee, Pickens said that Christ, who coincidentally was Lee's former girlfriend, was in the area the night of the murders and had seen Pickens running from the scene.

{¶ 106} The prosecutor informed the court that Lee's statement about Christ was checked out and nothing could be verified.  Trial counsel objected and stated that they should have been told in advance that Lee had made a false statement to the police.  The prosecutor added that he had interviewed Christ in Gehring's presence.  During that interview, Christ denied seeing Pickens running from the scene.  The prosecutor stated that her office would try to contact Christ if defense counsel wanted to talk to her, but that Christ had refused to divulge her phone number.  The defense declined, stating:  "We will just proceed.  I think it was a valid point to bring to the court's attention."

**{¶ 107}** Pickens fails to explain how the defense was prejudiced by the late disclosure of Christ's statement. Trial counsel did not request a continuance to talk with Christ before Lee testified. In addition, the defense was informed about Lee's statements and Christ's denials before Lee testified, and counsel later used this information to discredit Lee's testimony about Christ. During Lee's cross-examination, trial counsel asked, "Are you aware that [Christ] told the police that she didn't know anything about what you were talking about?" Lee replied, "No, I don't know nothing about that." *See State v. Kulchar*, 4th Dist. Athens No. 10CA6, 2011-Ohio-5144, ¶ 43 (no *Brady* violation where defense did not request a continuance and obtained statements before witnesses testified).

**{¶ 108}** Gehring's testimony also helped to eliminate any prejudice that might have resulted from the late disclosure of Lee's statements about Christ. During direct examination, Gehring was asked about Lee's testimony regarding Christ. Gehring testified that he had interviewed Christ, and she stated that she was not in the area at the time of the murders. Thus, Pickens has failed to establish a due-process violation based on late disclosure of information about Christ.

b. Opening statements and rebuttal arguments

**{¶ 109}** Pickens argues that the prosecutor committed misconduct during his opening statement and closing argument on rebuttal. Except where noted, however, trial counsel failed to object and thus waived all but plain error. *State v. Wade*, 53 Ohio St.2d 182, 373 N.E.2d 1244 (1978), paragraph one of the syllabus. To prevail on plain-error review, Pickens must establish both that misconduct occurred and that, but for the misconduct, the outcome of the trial clearly would have been otherwise. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002); Crim.R. 52(B).

**{¶ 110}** The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial

rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

*(1) Opening statements*

{¶ 111} First, Pickens argues that the prosecutor misstated the evidence and engaged in speculation when she interpreted Noelle's message "K" to Lewis (in response to Lewis's text that she was on her way) as meaning that she would leave her apartment to go with Lewis. Pickens argues that the prosecutor's interpretation was improper since there was no evidence other than "K."

{¶ 112} During the state's opening statement, the prosecutor discussed Noelle's exchange of text messages with Lewis just before the murders. The prosecutor stated that Noelle had texted Lewis at 11:12 p.m. that she had awakened to find Pickens inside her apartment, and at 11:37 she texted that he was gone. The prosecutor stated that Lewis replied, "You all don't need to be there with all that shit going on, for real. I am on my way." Noelle responded, " K," which the prosecutor stated meant, "Okay. I will go with you, you are right."

{¶ 113} "During opening statements, counsel is accorded latitude and allowed 'fair comment' on the facts to be presented at trial." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 145, quoting *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 157. The prosecutor's opening statement portrayed what happened to Noelle on the night of the murders. The prosecutor's statement that Noelle texting "K" meant that Noelle would go with Lewis was fair comment. Thus, the prosecutor's remarks were neither error nor plain error.

{¶ 114} Second, Pickens argues that the prosecutor committed misconduct when he stated towards the end of his opening statement:

Ladies and gentlemen, when all the evidence in this case is put in and you would consider it, there is only going to be but one fair, just, proper verdict you can return. There is only going to be one verdict you can return that would comport with the oaths you have taken as jurors.

And that is that this man right here is guilty of raping Noelle Washington, and then, that he is guilty of aggravated murder * * *.

{¶ 115} A prosecutor may not express his personal opinion as to the guilt of the accused. A prosecutor can, however, express a conclusion of guilt based on what the state believes that the evidence will show. *See State v. Gibson*, 4th Dist. Highland No. 03CA1, 2003-Ohio-4910, ¶ 39-40. Here, the prosecutor argued that the jury should return a finding of guilt after he had outlined the evidence that the jury would hear. Thus, the prosecutor's remarks did not represent an improper opinion regarding Pickens's guilt.

{¶ 116} Pickens makes a vague and unsupported argument that the prosecutor's comments were improper because he told the jury that it was their sworn duty to convict Pickens. The prosecutor was not asking the jurors to return a finding of guilty because of their oath. Rather, the prosecutor was linking the juror's responsibility to consider the evidence with their responsibility to return a "fair, just, [and] proper verdict." No plain error occurred.

*(2) Rebuttal arguments*

{¶ 117} Pickens also argues that the prosecutor committed misconduct during closing arguments on rebuttal. Both parties have latitude in responding to arguments of opposing counsel. *State v. Loza*, 71 Ohio St.3d 61, 78, 641 N.E.2d 1082 (1994).

**{¶ 118}** First, Pickens argues that the prosecutor improperly vouched for Detective Gehring by stating, "Detective Gehring is a 13-year veteran. He is young, he is smart and he is talented. And he is extremely competent to handle this case." The trial court sustained a defense objection to this argument and ordered it stricken.

**{¶ 119}** An attorney may not express a personal belief or opinion as to the credibility of a witness. *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997). "Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 232. Here, the prosecutor did not improperly vouch for Gehring. The prosecutor was responding to defense counsel's attacks on Gehring's competence. Counsel had argued that Gehring was inept in searching for the murder weapon, that he failed to swab Pickens's hands for gunshot residue after he was arrested, and that his competence in reconciling the different times on the surveillance tapes was questionable. *See State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 120; *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 95.

**{¶ 120}** Even assuming that the prosecutor's remarks were improper, these comments were not prejudicial. The trial court sustained a defense objection to this argument and ordered the remarks stricken. Any errors were also corrected by the trial court's instruction that the arguments of counsel were not evidence and that the jury was the sole judge of the facts. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 164.

**{¶ 121}** Second, Pickens argues that the prosecutor committed misconduct by mentioning that his counsel were two public defenders. Pickens claims that these comments implied that he received less effective representation than if he had been represented by private counsel.

{¶ 122} The prosecutor began his rebuttal argument with the following comments about trial counsel:

> This is actually the point where, in a little while, you are going to get ready to deliberate. I thought it was interesting when Mr. Ancona first introduced himself to you. I don't know why I picked up on this and I don't know if you did at all, but he said, we are Public Defenders representing Mark Pickens.
>
> What does everybody think when they think of Public Defenders? Overworked. Underpaid. You could care less about the people you represent. You are just going through the motions.
>
> And I think that when you review Mr. Aubin and Mr. Ancona's performance, it was passionate, they were well-prepared.
>
> These boxes have been there since day one. They put a lot of work into this case. They got every document. They poured over it. They knew what was coming. Nothing was left uncovered. I think you would agree.
>
> And that's the way it should be in a capital case. Nothing is left uncovered. Passionate. Fighting hard for their client.
>
> However, after all of that is said and done, the outcome is still the same. He is clearly guilty.

{¶ 123} It is improper to denigrate counsel in the jury's presence. *Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 219. The prosecutor's comments about trial counsel being public defenders and about public defenders generally were unnecessary, but they were made to counter a possible misperception on the part of the jury. The prosecutor's comments about trial counsel specifically were, however, complimentary. Nothing was said

indicating that Pickens would have received better representation from retained counsel. Under these circumstances, there is no reasonable basis to conclude that the result of the trial would have been different absent these improper comments. Thus, no plain error occurred.

{¶ 124} Third, Pickens argues that the prosecutor misstated and speculated on evidence not in the record during his rebuttal comments about DNA evidence and the rape offense:

> As far as nothing being done on the swabs that Dr. Ralston talked about, we have the swabs from the 31st. Only the defendant and Noelle Washington's DNA were on the swabs. There was no mixture of any other male or female donor. She was not with anybody else after the rape because we know exactly what she had been doing.
>
> Mr. Ancona: I object. No evidence to support that.
>
> The Court: It is closing argument. Sustained. Move on.

{¶ 125} Counsel also objected when the prosecutor continued this argument shortly thereafter:

> What's interesting, there was semen on the anal swab. At the time, you don't think much of it, and Bill Harry said, the way the female anatomy is, there is leakage because it comes out of the vagina and it travels down to the anal area.
>
> The reason that's critical in this case is that that semen was found on May 31. You are not going to have semen in the anal —
>
> Mr. Ancona: Objection.

The Court: Sustained. You are objecting to something not quite said yet.

Mr. Ancona: Objecting to his medical opinion.

The Court: Sustained.

Mr. Tieger: Ask yourself with normal hygiene, is there going to be semen in your anal area the next day after you supposedly had sex with somebody the day before?

{¶ 126} "Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn from the evidence." *Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, at ¶ 154. Here, trial counsel opened the door to the prosecutor's rebuttal argument. The defense argued that DNA evidence "doesn't show a rape on the 31st. It shows DNA of Mark Pickens within the last 72 hours." Trial counsel later asserted, "There is no evidence." The prosecutor could rebut these claims by pointing out that DNA testing identified Noelle's and Pickens's DNA on the vaginal swabs. Thus, the prosecutor's argument that Noelle "was not with anybody else" represented fair comment.

{¶ 127} As to the prosecutor's argument about semen on the anal swabs, these comments were based on William Harry's testimony that "the vagina and anal area are very near, * * * so it is not uncommon to have drainage that will result in having positive anal swabs or semen present on an anal swab * * *." Thus, the prosecutor's comments about the anal swabs rebutted defense arguments and bolstered the state's argument that Pickens's semen was deposited on May 31.

{¶ 128} Even assuming that the prosecutor's two arguments were improper, the trial court sustained defense objections, and Pickens has not demonstrated how these comments prejudiced him. Thus, there is little chance

that the result of the trial would have been different absent these comments. *See State v. Treesh*, 90 Ohio St.3d 460, 466, 739 N.E.2d 749 (2001).

{¶ 129} Fourth, Pickens argues that the prosecutor improperly demeaned him by labeling him a "killer" during rebuttal argument: "So, one killer to another, Pickens to Lee. All of you said in voir dire that you could accept an inmate witness. I am asking that you hold yourself to what you said earlier." The trial court overruled a defense objection to these comments.

{¶ 130} The prosecutor's comments responded to trial counsel's argument that Lee "says anything that will get him home. He is facing life without parole. He is a murderer, a confessed murderer." The defense also argued that Lee could have gotten the information about the murders from somebody else. During rebuttal, the prosecutor argued that Pickens might have told Lee about the murders because "when something happens to us, you have a need to tell other people. * * * It is very hard to keep a secret, very hard. Somebody eventually finds out. So, one killer to another, Pickens to Lee."

{¶ 131} Both parties have latitude during closing arguments and may be "colorful or creative." *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523 (1988). Here, the prosecutor was responding to defense arguments and explained why Pickens might have told Lee about the murders. Thus, the prosecutor's remarks represented fair comment and were not improper. *See State v. Tibbetts*, 92 Ohio St.3d 146, 168, 749 N.E.2d 226 (2001) (argument that defendant was a "trained killer" deemed fair comment); *State v. Nields*, 93 Ohio St.3d 6, 37, 752 N.E.2d 859 (2001) (argument that the defendant was a "mean-spirited derelict" represented fair comment). Even if the comment was improper, there is little chance that this isolated comment denied Pickens a fair trial.

{¶ 132} Fifth, Pickens argues that the prosecutor committed misconduct by unilaterally defining the term "nutted" as meaning ejaculation. He argues that

the interpretation was "pure speculation" and was prejudicial because it went to the essence of the rape conviction.

**{¶ 133}** During rebuttal argument, the prosecutor reviewed the taped phone conversation that Noelle had with Pickens about the rape:

> On the one-party consent call * * * here we go. * * * It is Noelle calling Mark Pickens. And talking about when the rape happened.
>
> She says, what does that matter. I am going to tell that you raped me, that you had sex with me when I didn't want you to and you beat me up
>
> Mark Pickens: Man, I did not rape you.
>
> The next page, and again, I apologize for how graphic this is.
>
> Noelle: So when you *nutted me*, that's not going to be yours?
>
> *Nutted is slang for ejaculated.*
>
> She says: It is fresh in my panties today.

(Emphasis added.)

**{¶ 134}** It was improper for the prosecutor to inject himself into the trial as a witness. The prosecutor's definition of the term "nutted" as "slang for ejaculated" did not deprive Pickens of a fair trial, because it was clear what Noelle was saying in using that term. (Nut" is vernacular for ejaculation or to ejaculate. *See* "Nut," Urban Dictionary, *http://urbandictionary.com/define.php?term=nut*.) Thus, no plain error occurred.

**{¶ 135}** Sixth, Pickens argues that the prosecutor denigrated defense counsel and the defense by stating: "Now, for [Pickens] to tell Detective Gehring

that he had no idea what that part [of the phone call] was about is ludicrous. It is not sleep deprivation." The prosecutor's comments responded to defense arguments that some of Pickens's incriminatory police statements might have been a "combination of confusion and sleep deprivation." The prosecutor argued that trial counsel's argument about sleep deprivation was "ludicrous" because Pickens knew about the rape allegations before the police interview. Noelle had called Pickens and accused him of raping her soon after it occurred. Thus, the prosecutor's characterization that these claims were "ludicrous" represented fair comment. *See State v. Martin*, 6th Dist. Erie No. E-11-020, 2013-Ohio-973, ¶ 42 (prosecutor's references to defendant's story to police as "ridiculous and nonsense" borne out by the evidence); *State v. Lamb*, 12th Dist. Butler Nos. CA2002-07-171 and CA2002-08-192, 2003-Ohio-3870, ¶ 32-34 (prosecutor's reference to defendants' story as "laughable, ridiculous, and crazy" in outlining the evidence against the defendants was not abusive or prejudicial). Thus, no plain error occurred.

{¶ 136} Seventh, Pickens argues that the prosecutor misstated and speculated on the evidence in stating: "He goes over there, he uses her own keys to get in her apartment, they go outside, there is an argument, he sweet talks his way back in knowing full well what he was going to do. Because no Noelle Washington means no charges because there is no victim." Here, the prosecutor was merely summing up the state's view of the evidence based on testimony presented during trial. "A prosecutor may state his or her opinion if it is based on the evidence presented at trial." *Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 213. Thus, no plain error occurred.

{¶ 137} Finally, Pickens argues that the prosecutor committed misconduct by mentioning the penalty phase during closing arguments: "This evidence is overwhelming. I would ask you to find him guilty. We will come back in a couple of days and figure out the appropriate penalty in the penalty phase of this

trial." The trial court sustained a defense objection to these comments and instructed the jury: "Your job today will be to begin deliberations on the question of guilt or innocence."

{¶ 138} The prosecutor committed misconduct by mentioning the penalty-phase proceedings during the trial-phase closing argument. Questions of punishment have no place in the trial of guilt or innocence. *See Brown*, 38 Ohio St.3d at 316, 528 N.E.2d 523; *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). But the prosecutor's ill-timed remarks did not result in reversible error. First, the trial court sustained a defense objection and told the jurors that their job was to deliberate on the question of guilt or innocence. Second, the trial court instructed the jurors to decide the verdict on the evidence alone and explained that the arguments of counsel were not evidence. Lastly, there was overwhelming evidence of guilt presented against Pickens, which " 'reduced the likelihood that the jury's decision was influenced by argument.' " *Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 169, quoting *Darden* at 182. When viewed in their entirety, the prosecutor's improper comments were not prejudicial and did not deny Pickens a fair trial. *See Leonard* at ¶ 169; *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 170.

{¶ 139} Based on the foregoing, we overrule proposition III.

4. *Admissibility of surveillance videos* (Proposition of law VII)

{¶ 140} Pickens argues that the trial court erred by admitting surveillance videos of the hallway outside his apartment and other locations around Gateway Plaza from May 31 through June 2, 2009. Pickens argues that the videos had been spliced together and were not properly authenticated.

a. Surveillance videos

{¶ 141} During the state's case-in-chief, Layne Hurst, the property manager at Gateway Plaza apartments, testified that he maintained the

surveillance cameras at Gateway Plaza. Hurst testified that Gateway Plaza had "eight different DVRs totaling somewhere over 140 cameras that encompass the entire property." He stated that "the DVRs actually do the work themselves. We just have the guards checking them daily."

{¶ 142} Over defense objection, the state presented the surveillance video taken outside Pickens's apartment on May 31. This video showed Noelle entering Pickens's apartment at 10:38 a.m. and coming out of his apartment, pulling up her pants, at 12:18 p.m. The video also showed Noelle seeking help from a neighbor, then returning to Pickens's apartment and struggling with him in the hallway. Finally, the video showed Noelle returning to the neighbor's apartment, Pickens leaving his, and police officers arriving at the scene.

{¶ 143} Over defense objection, the state also presented a surveillance video that spliced together different surveillance videos with time displays at Gateway Plaza for June 1 and 2. This video showed that Pickens left his apartment at 7:33 a.m., that two police officers arrived and left a business card in his door at 10:44 a.m., and that Pickens arrived home and discovered the card in his door at 10:32 p.m. This video showed the timing of Pickens's movements as he left his apartment, entered the elevator, walked through the lobby, and rode away on his bicycle. The video also showed when Pickens returned to Gateway Plaza on his bicycle.

{¶ 144} As to the spliced video, Hurst testified that he knew the different routes that Pickens could take from his apartment to the outside and only had to search five to ten different cameras. He obtained multiple DVDs from these cameras and provided them to the police. Hurst testified that the police spliced together multiple clips into a single disc "in an effort to make it better for a viewing audience." Hurst reviewed this disc with the police and testified that it represented a true and accurate reflection of the various discs that he provided to the police.

**{¶ 145}** Trial counsel objected to State's Exhibit 24B because there was a discrepancy on the times shown on the video. The outside surveillance video showed that Pickens returned to the Gateway Plaza on his bicycle at 12:04 a.m., while the hallway video showed that Pickens returned to his door at 11:58 p.m. Hurst explained the discrepancy by stating that "when the actual computers were installed * * * by ADT they left it at whatever time they currently had on the computers whenever they were initially installed and never changed back. That would create a time lapse in between each DVR, depending on when it was installed." Over defense objection, Gehring testified that he used his watch to reconcile the times. Gehring explained, "I wrote down the times the computer said, and I wrote down what time my watch said." He then determined that the clock for the outside video was five minutes fast and the clock for the video outside Pickens's apartment was two minutes slow.

b. Possible waiver

**{¶ 146}** The state argues that the defense waived any objection to the admissibility of the videos when trial counsel failed to renew its objection to the videos before they were admitted. Thus, the state argues that any error should be reviewed on the basis of plain error. *See State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus.

**{¶ 147}** The record shows that the trial court overruled the defense objection to the videos but offered counsel additional time to review the source tapes. Trial counsel responded, "Mr. Pickens would like to go forward" and declined the offer for additional time. The next day, the trial court asked counsel if they wanted to renew the objection. Trial counsel replied that Pickens "wants to go forward with what they have."

**{¶ 148}** We do not view trial counsel's statements as a waiver of the defense objection to the tapes. The trial court had ruled on Pickens's objection to the videos before counsel stated that Pickens wanted to "go forward." Moreover,

counsel's comments were made in the context of Pickens's decision to proceed with the trial rather than take additional time to review the source tapes.

c. Analysis

{¶ 149} Pickens argues that the spliced videos taken on May 31 through June 2 were not authenticated, but he provides no further argument or case authority for these claims. State's Exhibit 31A, the video taken outside Pickens's hallway on May 31, was not a spliced video. Thus, Pickens does not appear to be arguing that the trial court erred in admitting this video.

{¶ 150} Evid.R. 901(A) provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." In *Midland Steel Prods. Co. v. U.A.W. Local 486*, 61 Ohio St.3d 121, 753 N.E.2d 98 (1991), we held:

> "The admissibility of photographic evidence is based on two different theories. One theory is the 'pictorial testimony' theory. Under this theory, the photographic evidence is merely illustrative of a witness' testimony and it only becomes admissible when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on that witness' personal observation. * * * A second theory under which photographic evidence may be admissible is the 'silent witness' theory. Under that theory, the photographic evidence is a 'silent witness' which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness."

*Id*. at 129-130, quoting *Fisher v. State*, 7 Ark.App. 1, 5-6, 643 S.W.2d 571 (1982).

{¶ 151} Here, the videos were admissible under the "silent witness" theory. Hurst testified from personal knowledge about the installation of the surveillance system, the positioning of the cameras, and the method used for recording the video taken inside and outside the apartment building. No expert was required to substantiate the reliability of the surveillance system. *See Midland* at 130. Moreover, Pickens does not argue on appeal that there is any defect as to what was depicted in the footage. Under these circumstances, the state adequately showed the reliability of the surveillance system and the videos produced by it. Thus, the surveillance videos were properly authenticated. *See State v. Green,* 7th Dist. Mahoning No. 12 MA 226, 2014-Ohio-648, ¶ 12-14 (surveillance video admissible under the "silent witness" theory); *State v. Freeze*, 12th Dist. Butler No. CA2011-11-209, 2012-Ohio-5840, ¶ 67 (same).

{¶ 152} Pickens does not explain his objection to the authenticity of State's Exhibit 24B, which spliced together surveillance videos showing the time and progression of Pickens's movements on June 1 and June 2. Counsel complained at trial that the state had never disclosed that the video was a spliced version of events. The trial court replied, "I don't know how you cannot know that that was spliced from other recordings that were made because it shows—it takes him outside the building." But Pickens raises no objections on appeal about the state's failure to notify the defense that the videotape was spliced. Thus, we reject this claim.

{¶ 153} As a final matter, counsel argued at trial that State's Exhibit 24B should not have been admitted because of the time discrepancy. Gehring reconciled these times using his watch. Pickens does not argue that Gehring's testimony was inaccurate. In any event, any objections Pickens may have as to the timing system or other quality problems with the video go to its weight, not its admissibility. *See State v. McClellan*, 3d Dist. Allen No. 1-09-21, 2010-Ohio-

314, ¶ 73-74 (objections to videotape on grounds that it was of poor quality and had been shortened pertained to weight of evidence, not admissibility).

{¶ 154} Based on the foregoing, we overrule proposition VII.

4. *Admissibility of Noelle's statements under Evid.R. 804(B)(6) and sufficiency of the evidence of the R.C. 2929.04(A)(3) specification* (Proposition of law VI)

{¶ 155} Pickens challenges the sufficiency of the evidence to prove his guilt of the witness-murder specification, R.C. 2929.04(A)(8), that was charged in Specification 2 of Count Two (the aggravated murder of Noelle).

{¶ 156} We first note that Specification 2 of Count Two did not charge Pickens with committing the witness-murder specification under R.C. 2929.04(A)(8). Rather, Specification 2 charged Pickens with the escaping-detection specification under R.C. 2929.04(A)(3). Specification 2 followed the statutory language in R.C. 2929.04(A)(3) and charged that "MARK PICKENS committed the offense for the purpose of escaping detection or apprehension or trial or punishment for another crime committed by him, to wit: RAPE (2907.02 ORC)." Thus, the sufficiency of the evidence as to Specification 2 must be viewed in terms of the R.C. 2929.04(A)(3) specification.

{¶ 157} Pickens asserts that Noelle's statements to the police and other witnesses, her text messages, and her phone calls were improperly admitted under Evid.R. 804(B)(6). Pickens argues that absent this hearsay, there is insufficient evidence to support the findings of guilt as to this specification.

a. Evidence admitted under Evid.R. 804(B)(6)

{¶ 158} Under Evid.R. 804(B)(6), a statement offered against a party is not excluded as hearsay if the declarant is unavailable as a witness and "the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying." *See State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 84. To be admissible under

48

Evid.R. 804(B)(6), the offering party must show by a preponderance of the evidence: "(1) that the party engaged in wrongdoing that resulted in the witness's unavailability, and (2) that one purpose was to cause the witness to be unavailable at trial." 2001 Staff Notes, Evid.R. 804(B)(6); *Hand* at ¶ 84-87.

{¶ 159} The purpose prong of the forfeiture-by-wrongdoing doctrine was reviewed by the United States Supreme Court in *Giles v. California*, 554 U.S. 353, 366, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). *Giles* examined the common-law roots of the doctrine and concluded that this "exception applie[s] only when the defendant engaged in conduct *designed* to prevent the witness from testifying." (Emphasis sic.) *Id.* at 359. Accordingly, " 'unconfronted testimony [will] *not* be admitted without a showing that the defendant intended to prevent [the] witness from testifying.' " (Emphasis sic.) *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 106, quoting *Giles* at 361. *Giles* does not require that this be a defendant's sole or even his primary purpose; it is sufficient if one purpose for the defendant's conduct was to make the victim unavailable. *See State v. Supanchick*, 245 Or.App. 651, 658, 263 P.3d 378 (2011); *Hand* at ¶ 90.

*(1) Evidentiary hearing*

{¶ 160} The prosecution filed a pretrial notice of its intent to offer Noelle's statements under Evid.R. 804(B)(6). Before admitting these statements, the trial court conducted an evidentiary hearing. The trial court also considered Noelle's recorded police interview and the recorded phone call that Noelle made to Pickens while she was at the police station.

{¶ 161} During the evidentiary hearing, Detective Schroder testified that he interviewed Noelle shortly after she reported being raped on May 31. Noelle told Schroder that she had gone to see Pickens at his apartment. Noelle stated that she told Pickens she did not want to have sex after they had been "wrestling around on the bed" and he became "too aggressive." Pickens had pulled a gun out

of the dresser, forcibly removed her clothing, and raped her. Noelle told Pickens afterwards that she was calling the police, and Pickens took Noelle's phone to see who she called.

{¶ 162} The transcript of Noelle's recorded phone conversation with Pickens showed his awareness that Noelle had called the police. Pickens accused Noelle of putting out a warrant on him and said, "You was talking to them. You told them everything." Pickens added, "I guess you told police that * * * I raped you?" Noelle denied talking to the police. But Pickens replied, "And you did tell the police that because you was on the phone talking to my momma and * * * the police was right there."

{¶ 163} Jenkins, Tamika, Tanisha, Gwendolyn, Derrick, and Lewis all testified that Noelle told them that Pickens had raped her. Tamika also testified that she called Noelle's phone number and talked to a person she thought was Pickens. Tamika told him, "You are going to jail," and he replied, "That's okay, because if I go to jail, then I am going to fuck her up."

{¶ 164} Schroder testified that he went to Pickens's apartment on June 1 to interview him. Pickens was not home, so Schroder left his business card in the door with a note asking Pickens to contact him. Gehring stated that a surveillance video showed Pickens returning to his apartment on the night of the murders and looking at the business card left in his door. Pickens then left the apartment on his bicycle and returned around midnight.

{¶ 165} Crystal Lewis testified that on the evening of the murders, Noelle texted her and stated that Pickens was coming through the kitchen. Lewis then went to Noelle's apartment to get her daughter, Sha'railyn, who was staying there. Lewis arrived at the apartment about ten minutes later and found that Noelle, Sha'railyn, and Anthony had been shot to death.

{¶ 166} Gehring executed a search warrant of Pickens's apartment after the murders. Evidence was collected linking Pickens to the murders, including

Noelle's credit card, Anthony's social security card, and .45-caliber ammunition. The bicycle and the jacket Pickens was wearing when he left his apartment were also seized. Gehring stated that several areas on the bicycle and the sleeves and cuffs on the jacket later testified positive for the presence of gunshot residue.

{¶ 167} Gehring testified that Palmer told him that Pickens had asked her to beat up a girl that was trying to get him arrested for rape. Gehring also spoke to witnesses who were across the street from Noelle's apartment on the night of the murder. They saw Noelle arguing with a man on the street and saw them walk into Noelle's apartment. They then heard gunshots. Ronelle Harris identified Pickens as the person arguing with Noelle.

{¶ 168} Gehring also interviewed Pickens. Pickens proclaimed his innocence and stated that he had spent the entire evening in his apartment on the night of the murders.

{¶ 169} At the end of the evidentiary hearing, the trial court made the following ruling:

All right. I listened to the testimony. I do find the witnesses to be credible as to what Noelle Washington said, and so I do find that the state can get this evidence in. I find that beyond a preponderance or by a preponderance that the defendant engaged in wrongdoing that resulted in the witness' unavailability and one of the purposes was to make the witness unavailable for trial.

So there are certainly questions raised as to whether the police officers at the time really believed her. They questioned her statement and tested her but that is not as much an issue as the fact that they have proven beyond almost any doubt, certainly by a preponderance at this point in time.

You will be able to get into the evidence at trial.

*(2) Analysis*

**{¶ 170}** The evidence presented during the hearing established by a preponderance of the evidence that (1) Noelle was unavailable as the result of Pickens's wrongdoing and (2) Pickens engaged in wrongdoing with the purpose of making Noelle unavailable to testify against him. Pickens argues that the trial court erred in considering Noelle's testimony to decide whether it was admissible because there were too many inconsistencies to make it reliable.

**{¶ 171}** The admissibility of Noelle's statements was governed by Evid.R. 104(A). *See* 2001 Staff Notes Evid.R. 804(B)(6). Evid.R. 104(A) provides that all preliminary questions concerning the admissibility of evidence shall be determined by the court, and "[i]n making its determination [the court] is not bound by the rules of evidence except those with respect to privileges." Thus, the trial court could consider hearsay evidence, including Noelle's own out-of-court statements. *See Davis v. Washington*, 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), citing *Commonwealth v. Edwards*, 444 Mass. 526, 545, 830 N.E.2d 158 (2005); *Jenkins v. United States*, 80 A.3d 978, 996 (D.C.2013) (court may consider substance of proffered hearsay in determining whether hearsay exception applies); *Vasquez v. People*, 173 P.3d 1099, 1105 (Colo.2007) (hearsay statements of unavailable victim admissible in forfeiture-by-wrongdoing evidentiary hearing).

**{¶ 172}** The testimony showed that Pickens knew that Noelle had called the police and reported the rape and the beating. Pickens accused Noelle of telling the police "everything" and wanted to know whether there was a warrant out for his arrest.

**{¶ 173}** Second, the evidence established that Pickens intended to harm Noelle to keep her from testifying against him. Pickens asked Palmer "to go beat a girl up" who had accused him of rape, and Pickens was carrying a handgun

when he talked to her. Pickens also told Tamika that "if I go to jail, then I am going to fuck her up."

{¶ 174} Finally, the evidence showed that Pickens killed Noelle after he learned that the police were looking for him. On the day of the murders, Pickens returned to his apartment and found the card that the police had left in his door asking Pickens to call them. Surveillance video showed that Pickens then left his apartment on his bicycle, returning shortly after the murders had occurred. Noelle sent Lewis a text stating that Pickens was coming through her kitchen shortly before she was shot. Other witnesses saw Pickens and Noelle arguing outside her apartment during that time frame. In addition, property seized from Pickens's apartment after the murders and other forensic evidence linked Pickens to the murders.

{¶ 175} Nevertheless, Pickens argues that the trial court should not have admitted Noelle's statements under the forfeiture-by-wrongdoing exception because there were discrepancies and inconsistencies in Noelle's statements that made them unreliable. Other evidence showed that Noelle was untruthful in telling the police that she was six months pregnant and that Pickens was the father of her unborn child, that she was wearing only a t-shirt when she left Pickens's apartment, and that Pickens had hit her approximately 25 times. In addition, Noelle told the police that she had gone to Pickens's apartment to have sex, told her mother that she had gone to collect money, and told Lewis that her purpose was to talk to Pickens.

{¶ 176} Noelle was untruthful about being pregnant, and there were other discrepancies in her statements about what happened. But Noelle was consistent in telling the police and numerous friends and family members that Pickens had raped her at his apartment on May 31. The decision to admit Noelle's statements was within the trial court's discretion. *See Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 92; *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d

343 (1987), paragraph two of the syllabus (the admission of relevant evidence rests in the sound discretion of the trial court). Thus, we conclude that the trial court did not abuse its discretion in admitting Noelle's statements under Evid.R. 804(B)(6).

{¶ 177} Next, Pickens claims that the trial court did not consider his claims of innocence before admitting Noelle's statements under Evid.R. 804(B)(6). During his recorded phone conversation with Noelle, Pickens repeatedly denied raping or hitting Noelle. The record shows that the trial court was presented with the transcript of the telephone conversation before ruling on the admissibility of Noelle's statements. The trial court also heard other testimony that called Pickens's credibility into question. During a police interview after the murders, Pickens claimed that he had never left his apartment on the night of the murders and stated that he did not have any ammunition in his apartment. But surveillance video showed Pickens leave his apartment about 10:30 p.m. on the night of the murders, and the police found .45-caliber ammunition during the search of Pickens's apartment. Thus, this claim also lacks merit.

{¶ 178} Finally, Pickens argues that Noelle's statements were not admissible because he had not been charged with rape at the time of the murders. But Evid.R. 804(B)(6) " 'extends to potential witnesses.' " *Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 90, quoting 2001 Staff Notes, Evid.R. 804(B)(6); *United States v. Houlihan*, 92 F.3d 1271, 1279 (1st Cir.1996) (rule applies with "equal force if a defendant intentionally silences a *potential* witness" [emphasis sic]). Thus, the fact that no charges were pending against Pickens at the time he killed Noelle did not preclude the admissibility of Noelle's statements.

{¶ 179} Based on the foregoing, we conclude that the trial court did not abuse its discretion in ruling that Noelle's statements were admissible under Evid.R. 804(B)(6).

b. Sufficiency of the evidence of the R.C. 2929.04(A)(3) specification

**{¶ 180}** The standard when testing the sufficiency of the evidence " 'is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 70, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

**{¶ 181}** R.C. 2929.04(A)(3) provides that the death penalty may be imposed when it is proven beyond a reasonable doubt that the offense "was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender." The defendant's commission of the prior offense constitutes an essential element of the (A)(3) specification. *See State v. Jones*, 91 Ohio St.3d 335, 347, 744 N.E.2d 1163 (2001). Here, Pickens was charged with escaping detection or apprehension for committing rape.

*(1) Sufficiency when Noelle's statements are included*

**{¶ 182}** We will first determine whether the evidence was sufficient to establish Pickens's guilt of the R.C. 2929.04(A)(3) specification beyond a reasonable doubt when that evidence includes Noelle's statements. First, the jury found Pickens guilty of rape in Count One, and the evidence shows that the jury could reasonably reach this verdict. Noelle reported that Pickens had raped her almost immediately after the rape occurred. She described the rape in great detail. Other evidence also corroborated her accusations, including a surveillance video showing Noelle exiting Pickens's apartment in disarray, Tucker's testimony that

Noelle beat on her door and pleaded for help, and testimony from other friends and family members that Noelle had told them that Pickens had raped her.

{¶ 183} Noelle's physical examination and DNA evidence provided additional evidence that she had been raped. Ferrara, the sexual-assault nurse examiner, examined Noelle after the rape. Ferrara observed swelling and a bite mark on Noelle's upper lip, lacerations on Noelle's neck, chest, and shoulder, bite marks on her chest and thigh, and bruises on her inner calf and left knee. Ferrara concluded that these injuries were "consistent with someone that is not * * * having consensual sex." Testing also established that DNA extracted from the vaginal swab collected during the rape exam matched the DNA profile of Pickens.

{¶ 184} Second, the jury could reasonably conclude that Pickens killed Noelle at least in part "for the purpose of escaping * * * trial, or punishment" for the rape. Pickens knew that Noelle had called police and reported that he had raped her. During the recorded telephone conversation, Pickens accused Noelle of putting out a warrant on him. He said, "You was talking to them. You told them everything." Pickens also added, "I guess you told police that too, that I raped you?" Moreover, Palmer's and Tamika's testimony demonstrated that Pickens intended to harm Noelle to keep her from testifying. Pickens asked Palmer to beat up a girl who had accused him of rape, and he told Tamika that "if I go to jail, I am going to fuck her up."

{¶ 185} Other evidence also showed that Pickens killed Noelle after he learned that the police were looking for him. A surveillance video showed Pickens returning to his apartment on the night of the murders and looking at a business card that the police left in his door. The video then showed Pickens leaving his apartment on his bicycle and returning around midnight. The timing of Pickens's departure and return coincided with the murders.

{¶ 186} Third, the evidence established that Pickens had committed the murders. Crystal Lewis testified that Noelle texted her and stated that Pickens

was coming into the apartment shortly before the murders. Ronell Harris testified that at 11:40 p.m. on June 1, he saw Noelle and a man he later identified as Pickens outside Noelle's apartment. Cynthia Evans also testified that she saw a man and woman arguing in front of Noelle's apartment that evening. She then saw them enter the apartment and heard gunshots shortly thereafter. Other evidence also linked Pickens to the murders. Noelle's credit card, Anthony's social security card, a bicycle, the jacket that Pickens was wearing on the night of the murders, and .45-caliber ammunition were collected from Pickens's apartment. The victims were killed by .45-caliber ammunition. Forensic tests showed that gunshot residue was found on Pickens's jacket and parts of the bicycle. Finally, Lee testified that Pickens admitted that he had committed the murders.

{¶ 187} Based on these facts, the jury could reasonably conclude that Pickens killed Noelle at least in part to keep her from pursuing the rape charge against him. Thus, we conclude that the evidence supports the jury's finding of guilt as to Specification 2 of Count Two. *See State v. Wiles*, 59 Ohio St.3d 71, 85, 571 N.E.2d 97 (1991) (where accused kills the only witness to his crime, there exists sufficient circumstantial evidence that the act was undertaken for the purpose of avoiding detection).

*(2) Sufficiency without Noelle's statements*

{¶ 188} Even if we assume that Noelle's statements were not admissible under Evid.R. 804(B)(6), we hold that their admission was harmless beyond a reasonable doubt. Other properly admitted evidence established that Pickens was guilty of the (A)(3) specification.

{¶ 189} Some of Noelle's statements were admissible under other rules of evidence. Noelle's statements to Tucker immediately following the rape were admissible as an excited utterance under Evid.R. 803(2), including her statement

that Pickens "had a gun and that he raped her." *See Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 100.

{¶ 190} Noelle's statements to Ferrara during her physical examination were also admissible. *See* Evid.R. 803(4). Ferrara, the examining nurse, could testify that Noelle told her that she went to Pickens's apartment, that he insisted on having sex, and that he forced her to have sex after she said no. Ferrara could also testify about the injuries she observed during her examination of Noelle that were "consistent with someone that is not * * * having consensual sex."

{¶ 191} Other admissible evidence included Tamika's and Palmer's testimony showing that Pickens knew that Noelle had told the police about the rape and intended to harm Noelle. In addition, the surveillance videos, testimony that Pickens and Noelle were observed arguing outside her apartment shortly before the murders, items collected from Pickens's apartment linking him to the murders, forensic evidence, and Lee's testimony all provided overwhelming evidence of Pickens's guilt as to Specification 2 of Count Two.

{¶ 192} Based on the foregoing, we reject proposition VI.

5. *Sufficiency of the evidence of the rape and aggravated-murder counts* (Proposition of law IX)

{¶ 193} Pickens challenges the sufficiency of the evidence for his convictions of aggravated murder and rape. As discussed in proposition of law VI, Noelle's statements, Pickens's statements, items seized from his apartment, and circumstantial and forensic evidence were sufficient to prove beyond a reasonable doubt that Pickens was guilty of raping Noelle and of committing the three aggravated murders. Pickens makes several claims challenging the sufficiency of the evidence.

{¶ 194} First, Pickens argues that the evidence failed to establish that he engaged in a "sexually-related encounter" with Noelle on May 31. The contrary evidence is overwhelming. Noelle reported the rape almost immediately after it

occurred. Surveillance video showed Noelle leaving Pickens's apartment in disarray and seeking help from a neighbor. Moreover, Ferrara examined Noelle a short time after the rape occurred and observed numerous injuries that corroborated Noelle's accusations. Tests showed that DNA extracted from the vaginal swabs collected during the rape exam matched Pickens.

{¶ 195} Pickens emphasizes that he denied raping Noelle. But the weight and credibility of the evidence are left to the trier of fact. *State v. Waddy*, 63 Ohio St.3d 424, 430, 588 N.E.2d 819 (1992). Pickens's denial does not render the evidence of his guilt insufficient. Here, the evidence was such that the jury could reject Pickens's claims and find beyond a reasonable doubt that Pickens was guilty of raping Noelle. Thus, we reject this claim.

{¶ 196} Second, Pickens argues that "nothing" demonstrates that he murdered Noelle and the two children. Pickens contends that hearsay testimony admitted pursuant to Evid.R. 804(B)(6) was the primary evidence used to find him guilty. He also asserts that Noelle's statements were inconsistent and were insufficient for the jury to find him guilty of the murders.

{¶ 197} As discussed in proposition VI, Noelle's statements were admissible under Evid.R. 804(B)(6). There were inconsistencies in Noelle's statements, but "[i]t was up to the jurors to weigh these inconsistencies and assess the witnesses' credibility." *Williams*, 79 Ohio St.3d at 10, 679 N.E.2d 646. Despite some discrepancies, the jury accepted the testimony of the state's witnesses and Noelle's statements. Furthermore, a review of the entire record shows that the testimony and Noelle's statements were neither inherently unreliable nor unbelievable. *See State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 201-202. Thus, we also reject this challenge to the sufficiency of the evidence.

{¶ 198} Based on the foregoing, we overrule proposition of law IX.

*B. Ineffective assistance of counsel*

{¶ 199} In proposition of law IV, Pickens raises various claims that his counsel provided ineffective assistance during both phases of the trial. Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Accord State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

1. *Failure to call an alibi witness*

{¶ 200} Pickens asserts that his counsel were ineffective by failing to call his mother, Truvena Griffin, as an alibi witness. Pickens claims that Griffin would have provided him with an alibi as to his whereabouts at the time of the murders.

{¶ 201} On April 5, 2010, the defense filed a pretrial notice of an alibi defense, stating: "On the night of June 1, 2009, from 10:37 p.m. until 11:58 p.m., Mark Pickens was either going directly to, coming directly from, or present at his mother, Truvena Griffin's home located at 711 Derrick Turnbow St.; Cincinnati, Ohio 45214." On April 14, 2010, the trial court filed an entry stating, "Upon motion of defendant, Mark Pickens, his notice of alibi previously filed on April 5, 2010, is hereby withdrawn on April 9, 2010 before start of voir dire." Pickens's and counsel's signatures appear on the entry.

{¶ 202} Pickens alleges that his mother's testimony would have shown that he was at another location at the time of the murders. Nothing in the record indicates that Griffin could have supported Pickens's alleged alibi. This claim rests on mere speculation and is insufficient to establish ineffective assistance. *See State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 119.

**{¶ 203}** Moreover, "counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *Treesh*, 90 Ohio St.3d at 490, 739 N.E.2d 749. The proposed alibi testimony was contradicted by other evidence, including three witnesses who placed Pickens at or near Noelle's apartment at the time of the murders. In addition, property seized during a search of Pickens's apartment and forensic evidence directly linked Pickens with the murders. It would have been devastating to Pickens had counsel called an ineffective alibi witness, enabling the prosecution to discredit this line of defense. *See State v. Baker*, 12th Dist. Clermont No. CA2005-11-103, 2006-Ohio-5507, ¶ 9. Given such evidence, counsel were not ineffective by failing to call this alibi witness.

2. *Failure to ask a juror follow-up questions about the death penalty and failure to challenge a biased juror*

**{¶ 204}** Pickens argues that trial counsel were ineffective by failing to effectively question juror Carroll about his views favoring the death penalty. Pickens also contends that that counsel were ineffective by leaving Carroll on the jury because he made racially biased statements about young black men.

**{¶ 205}** This court has consistently declined to "second-guess trial strategy decisions" or impose "hindsight views about how current counsel might have voir dired the jury differently." *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998). "[C]ounsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001).

**{¶ 206}** First, Pickens claims that counsel should have conducted further questioning to show his views favoring the death penalty. Carroll answered that he had "no problem" with the death penalty on his questionnaire. During voir dire, Carroll stated his views on the death penalty: "I feel it is an unfortunately necessary tool in our society. There are some people that need to be removed

from society. I don't have any trouble with it. If they have committed a crime that, as you say, meets the specifications, I wouldn't have any trouble at all." Carroll also told the prosecutor that he could choose between the life and death options and would follow the law given by the judge.

{¶ 207} Carroll's views about the death penalty were set forth on his questionnaire and in response to the prosecutor's questioning. Pickens does not explain what additional questions counsel should have asked. Counsel "need not repeat questions about topics already covered by * * * opposing counsel or the judge." *State v. Watson*, 61 Ohio St.3d 1, 13, 572 N.E.2d 97 (1991). Nothing in the record suggests that further questioning would have elicited new information. Thus, we conclude that counsel were not ineffective by failing to ask Carroll further questions about his views on the death penalty.

{¶ 208} Second, Pickens argues that Carroll's position favoring the death penalty means that he should have been dismissed to ensure a fair trial. Carroll stated, however, that he could consider life sentences and would follow the law in considering whether to impose a death sentence. These answers show that Carroll would not automatically vote for death, and a challenge for cause would not have been granted. Thus, counsel was not ineffective by failing to make such a challenge. *See Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 81-82.

{¶ 209} Third, Pickens argues that trial counsel should have challenged Carroll because he made racially biased statements. The questionnaire asked, "Is there any racial or ethnic group that you do not feel comfortable being around?" Carroll answered "yes," and explained: "Young black men with their pants down to their knees." The questionnaire also asked, "Have you ever had a negative or frightening experience with a person of another race?" Carroll answered "yes," and explained: "At a gas station – black man appeared – 'Give me your wallet or die right here.' " Another question asked for thoughts on "the issue of racial

discrimination against African-Americans in our society." From the several options offered as answers, Carroll chose the one that read "[a] very serious problem."

{¶ 210} During voir dire, the prosecutor asked Carroll about the robbery. Carroll stated that the robbery occurred at a gas station in "1970, late '60s." Carroll said that a young man had pointed a gun at him and threatened to kill him if he did not turn over his wallet. Carroll gave the man his wallet, and the robber fled. Carroll notified the police but was unable to provide them with enough information to conduct an investigation. Carroll was not asked about his comment regarding "[y]oung black men with their pants down to their knees."

{¶ 211} "The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans*, 63 Ohio St.3d 231, 247, 586 N.E.2d 1042 (1992). Moreover, we have held that "[t]he decision to voir dire on racial prejudice is a choice best left to a capital defendant's counsel." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 170.

{¶ 212} Normally, we defer to counsel's decision on whether to ask a prospective juror about racial bias. *See Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 218. There appears to be no discernable reason, however, why counsel would not question Carroll about his racially based comments to determine whether he was a biased juror. The state also provides no explanation for this lapse. Thus, we conclude that trial counsel were deficient by failing to ask further questions about Carroll's racially based comments.

{¶ 213} The *Strickland* test requires a finding of prejudice before this court can find ineffective assistance. 466 U.S. at 693, 104 S.Ct. 2052, 80 L.Ed.2d 674. To maintain a claim that he was prejudiced by counsel's failure to challenge an allegedly biased juror, Pickens " '*must* show that the juror was *actually biased* against him.' (Emphasis added.)" *Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836,

873 N.E.2d 828, at ¶ 67, quoting *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001). Although Pickens argues that Carroll was biased against African Americans, nothing indicates that he was actually biased against Pickens. Under questioning, Carroll said nothing to indicate that he harbored a racial bias as a result of the robbery that had occurred in "1970, late '60s." In addition, Carroll's comment about "[y]oung black men with their pants down to their knees" does not necessarily reflect bias against Pickens personally. Whether failure to strike Carroll from the panel was prejudicial is speculative because it is possible that he might have been rehabilitated under further questioning. *See Hale* at ¶ 213.

{¶ 214} Finally, Pickens argues that counsel were ineffective by failing to challenge Carroll because he was biased. As discussed, the record does not establish that a challenge for cause would have been granted. Pickens also suggests that counsel should have removed Carroll with a peremptory challenge. "But ' " '[b]ecause the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process.' " ' " *Mundt* at ¶ 83, quoting *People v. Freeman,* 8 Cal.4th 450, 485, 34 Cal.Rptr.2d 558, 882 P.2d 249 (1994), quoting *People v. Montiel*, 5 Cal.4th 877, 911, 21 Cal.Rptr.2d 705, 855 P.2d 1277 (1993). Here, counsel's decision not to peremptorily challenge Carroll does not demonstrate "reversible incompetence."

3. *Failure to exhaust peremptory challenges*

{¶ 215} Pickens argues that his counsel provided ineffective assistance by failing to exhaust all of its peremptory challenges. Trial counsel informed the court:

Mr. Ancona: At this time we waive also and we would like to place [on the] record at this time we discussed this before today started, this morning before we started, and again, just this moment with our client and he understand[s] that we could exercise a total

of six peremptory challenges. He is satisfied with the jury and wishes to waive; is that correct, sir?

The defendant: Yes.

**{¶ 216}** Decisions on the exercise of peremptory challenges are a part of trial strategy. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 99. Trial counsel, who observe jurors firsthand, are in a much better position than a reviewing court to determine whether a prospective juror should be peremptorily challenged. Pickens argues that trial counsel should have peremptorily challenged "pro-death-penalty" Carroll. But, as discussed in the previous proposition of law, Pickens cannot show that counsel were ineffective by failing to peremptorily challenge Carroll. Pickens also informed the court himself that he was satisfied with the composition of the jury and wished to waive the exercise of further peremptory challenges. Thus, we overrule this ineffectiveness claim.

4. *Failure to present evidence about adaptability to prison*

**{¶ 217}** Pickens argues that trial counsel were ineffective by failing to present any evidence showing his adaptability to prison life. Resolving this claim in Pickens's favor would be speculative. Nothing in the record indicates what evidence could have been presented as to Pickens's ability to adapt to prison. Establishing that would require proof outside the record, such as affidavits demonstrating the probable testimony. Such a claim is not appropriately considered on a direct appeal. *See State v. Madrigal*, 87 Ohio St.3d 378, 391, 721 N.E.2d 52 (2000). Thus, we also reject this ineffectiveness claim.

5. *Failure to have Pickens evaluated by a neuropsychologist*
*and failure to present psychological evidence*

**{¶ 218}** Pickens argues that his counsel were ineffective by failing to request that a neuropsychologist examine him for brain trauma and by failing to present any psychological evidence during the mitigation phase of the trial.

**{¶ 219}** An attorney's failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 521-522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Defense counsel has a duty to investigate the circumstances of his client's case and explore all matters relevant to the merits of the case and the penalty, including the defendant's background, education, employment record, mental and emotional stability, and family relationships." *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir.2011). Pickens has the burden of demonstrating that his counsel rendered ineffective assistance by failing to conduct an adequate investigation. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 104, citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. See *State v. Herring*, ___Ohio St.3d ___, 2014-Ohio-5228, ___N.E.3d___ (death penalty vacated because of failure to conduct thorough and adequate mitigation investigation).

**{¶ 220}** Pickens argues that counsel were ineffective by failing to have Pickens examined by a neuropsychologist to detect whether he suffered from brain damage or some other abnormality. Counsel hired two psychologists and a psychiatrist. Billing records show that Dr. Brian Masterson, the psychiatrist, interviewed Pickens four times, reviewed documentation, and met with defense counsel on two occasions. Billing records also show that Dr. Scott Bressler, one of the psychologists, interviewed Pickens twice, conducted testing, and met with defense counsel. Dr. Nancy Schmidtgoessling, another psychologist, was also consulted.

{¶ 221} The record does not indicate, beyond the billing statements, the extent of the psychiatric and psychological evaluations of Pickens's mental condition. But it is certainly possible that these experts evaluated Pickens and decided that a neurological evaluation was unnecessary. We will not infer a defense failure to investigate from a silent record; the burden of demonstrating ineffective assistance is on Pickens. *Hunter* at ¶ 68; *Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 244. *See Herring* at ¶ 104. Thus, Pickens has failed to demonstrate that counsel were deficient by failing to have a neuropsychologist evaluate him.

{¶ 222} Next, Pickens argues that trial counsel were ineffective by failing to present any evidence of his mental status or other psychological testimony about him during mitigation. "The defense decision to call or not call a mitigation witness is a matter of trial strategy. * * * Debatable trial tactics generally do not constitute ineffective assistance of counsel." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 116.

{¶ 223} It is unclear why defense counsel did not present testimony about Pickens's psychological status or background during mitigation. The record indicates, however, that the decision not to present such evidence was not the result of an inadequate investigation. See *Herring* at ___ (mitigation specialist admits that his investigation was "substandard"). Counsel hired two psychologists and a psychiatrist. Thus, Pickens's counsel would have had ample information about Pickens's psychological background to make an informed decision whether to present such evidence during mitigation. Accordingly, counsel's decision was a matter of trial strategy and does not constitute ineffective assistance of counsel. *See State v. Keith*, 79 Ohio St.3d 514, 530, 684 N.E.2d 47 (1997) ("the presentation of mitigating evidence is a matter of trial strategy").

{¶ 224} Pickens includes in the appendix to his brief the affidavit of Dr. Bob Stinson, a psychologist, and a letter from Dr. Barry Layton, a clinical

neuropsychologist, which were submitted as part of Pickens's petition for postconviction relief, in arguing that counsel were obliged to present expert psychological testimony during mitigation. Pickens cannot, however, refer to matters outside the record to support his claim on direct appeal. *See Madrigal*, 87 Ohio St.3d at 391, 721 N.E.2d 52.

{¶ 225} In his reply brief, Pickens argues that the American Bar Association's guidelines required trial counsel to present psychological testimony in his behalf. *See Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (Rev.Ed.2003). The ABA guidelines are not "inexorable demands" with which all capital defense counsel must fully comply. *Bobby v. Van Hook*, 558 U.S. 4, 9, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009); *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 183. Moreover, "[a]ttorneys are not expected to present every potential mitigation theory, regardless of their relative strengths." *Fears v. Bagley*, 462 Fed.Appx. 565, 576 (6th Cir.2012). Thus, trial counsel were not duty-bound to present psychological testimony during mitigation.

6. *Failure to present evidence of residual doubt*

{¶ 226} Pickens argues that trial counsel provided ineffective assistance by raising residual doubt and then failing to present persuasive evidence to support this claim. In *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), syllabus, we held that "[r]esidual doubt is not an acceptable mitigating factor under R.C. 2929.04(B), since it is irrelevant to the issue of whether the defendant should be sentenced to death." *Id.* at syllabus. Residual doubt of guilt has been defined as "a lingering uncertainty about facts, a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.' " *Franklin v. Lynaugh*, 487 U.S. 164, 188, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring in judgment).

**{¶ 227}** In a pretrial motion, counsel requested that the defense be allowed to present evidence and argument on residual doubt during mitigation and that the jury be instructed on residual doubt as a mitigating factor. The trial court denied this request. Nevertheless, trial counsel made an argument to the jury that residual doubt was a reason not to impose death during the mitigation-phase arguments. Before sentencing, counsel argued to the trial court that "significant residual doubt * * * must be weighed and considered" before imposing sentencing. The trial court stated:

> The defense has requested both in writing and verbally that I consider residual doubt. I have considered that. I am not sure it is appropriate, but * * * to be fair, I have considered the jury was given the chance after the guilty verdicts to review the evidence again because the request to examine the case as to whether there was residual doubt was raised during closing arguments in the penalty phase. * * * I have since reviewed the physical evidence on several occasions. This is given no weight with me because with the facts in evidence in the case, there is no doubt whatsoever that the defendant committed these offenses.

**{¶ 228}** Even though the court denied a defense motion to present residual doubt, trial counsel made an argument that the jury and the trial court should consider residual doubt before imposing the death penalty. Pickens fails to explain what else trial counsel could have done in presenting the issue of residual doubt. Pickens also does not explain how any failure was prejudicial. *See Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, at ¶ 203. Thus, he has failed to demonstrate that counsel were ineffective in presenting such evidence.

{¶ 229} Based on the foregoing, we reject proposition IV.

*C. Remaining issues*

1. *Cumulative error* (Proposition of law X)

{¶ 230} Pickens argues that cumulative errors committed during the trial deprived him of a fair trial and require a reversal of his convictions and death sentence. Under the doctrine of accumulated error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the instances of trial-court error does not individually constitute cause for reversal. *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus; *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 222-224; *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

{¶ 231} The doctrine of cumulative error is not applicable. Pickens received a fair trial. Moreover, none of the errors committed in this case, whether considered individually or cumulatively, resulted in prejudice. As previously discussed in other propositions of law, overwhelming evidence was introduced that established Pickens's guilt. Thus, proposition X is overruled.

2. *Constitutionality of death penalty* (Proposition of law VIII)

{¶ 232} Pickens challenges the constitutionality of Ohio's death-penalty statutes. These claims can be summarily rejected. *See Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 215-216; *State v. Carter*, 89 Ohio St.3d 593, 607, 734 N.E.2d 345 (2000); *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph one of the syllabus.

{¶ 233} In addition, Pickens claims that Ohio's death-penalty statutes violate international law and treaties to which the United States is a party. These arguments lack merit. *See State v. Issa*, 93 Ohio St.3d 49, 69, 752 N.E.2d 904 (2001); *State v. Phillips*, 74 Ohio St.3d 72, 103-104, 656 N.E.2d 643 (1995).

3. *Appropriateness of death sentence* (Proposition of law V)

{¶ 234} Pickens argues that the death penalty is not appropriate because he was only 19 years old when he committed the offenses and because he has a mother who loves him and who asked the court to spare his life. We shall consider these arguments during our independent sentence evaluation.

## IV. Independent Sentence Evaluation

{¶ 235} Having considered, and rejected, Pickens's propositions of law, we must now independently review Pickens's death sentence for appropriateness and proportionality. R.C. 2929.05(A). In conducting this review, we must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether Pickens's death sentence is proportionate to those affirmed in similar cases. *State v. Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, 3 N.E.3d 1051, ¶ 188.

*A. Aggravating circumstances*

{¶ 236} Pickens was convicted of two death specifications for each of the three counts of aggravated murder. The jury found that Pickens killed all three victims as "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." R.C. 2929.04(A)(5). As to Sha'railyn and Anthony, the jury also found violations of R.C. 2929.04(A)(9), murdering a child under the age of 13. As to Noelle, the jury found a violation of R.C. 2929.04(A)(3), murder to escape accounting for a crime.

{¶ 237} First, with respect to Noelle's murder, Pickens's actions were purposeful and were intended to keep her from testifying against him for rape. The evidence established that Pickens raped Noelle on May 31, 2009. After Pickens learned that Noelle had notified the police, he then took steps to keep Noelle from testifying against him by asking Palmer to beat her up. He also told Tamika that "if I go to jail, I am going to fuck her up."

{¶ 238} On June 1, Pickens learned that the police had been to his apartment and were looking for him. He then rode his bicycle to Noelle's residence, where witnesses saw Noelle and Pickens talking outside. Noelle also sent text messages indicating that Pickens was inside her apartment shortly before the murders occurred. Surveillance videos, property seized from Pickens's apartment after the murders, and other forensic evidence linked Pickens to the murders. Thus, the evidence at trial supports the jury's finding of this aggravating circumstance.

{¶ 239} Second, the evidence showed that the murders of Noelle, Sha'railyn, and Anthony were part of a single continuing course of conduct. Pickens murdered all three victims inside Noelle's apartment on June 1. Thus, the killings were directly linked in time and location. *See State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, at syllabus, and ¶ 52 (factors such as time, location, a common scheme, or a common psychological thread can establish the factual link necessary to prove a course of conduct). Pickens also told Lee that he killed Sha'railyn because she knew him and could identify him and intimated to Lee that he had killed Anthony because he "got a rush out of it." Thus, the evidence supports Pickens's conviction under R.C. 2929.04(A)(5) with respect to each of the three counts of aggravated murder.

{¶ 240} Finally, evidence was presented that Sha'railyn was three years old and Anthony was nine months old at the time of their deaths. Accordingly, the evidence also supports Pickens's conviction under R.C. 2929.04(A)(9) for these two counts of murder.

### B. Mitigating evidence

{¶ 241} Against these aggravating circumstances, we must weigh the mitigating factors contained in R.C. 2929.04(B). During mitigation, the defense called Truvena Griffin, the defendant's mother, and Pickens made an unsworn

statement. Pickens also made a statement in allocution and answered the trial court's questions about his background.

### 1. Griffin's testimony

**{¶ 242}** Griffin testified that Pickens was born when she was 16 years old and that he is the oldest of her four children. As to her own background, Griffin stated that her mother was 14 when she was born. Griffin also stated that she was abused as a child and lived in 15 to 20 different foster homes.

**{¶ 243}** Griffin told the families of the victims, "I am sad that this happened for you. I grieve, and I pray for you and I don't wish this on any family." She also stated, "I love my son. And I beg you to spare his life. It is my first son."

### 2. Pickens's unsworn statement

**{¶ 244}** Pickens expressed his sorrow for the death of the three victims but maintained his innocence:

> I am terribly sorry that Noelle, Sha'railyn, and Anthony were killed, but I did not do it. I had no reason to. I would never hurt anyone like that.
>
> * * *
>
> I don't want to hurt anyone like that, especially children. I have a three year old myself.
>
> I liked Noelle and I never would have killed her.
>
> She baby was a part of my life.
>
> I know the families of Noelle, Sha'railyn, Anthony hate me for this. If I did it, I would hate myself, too.
>
> I was going to school to be a nursing assistant. I wanted to help people.

I felt worse for my mother than me.  She cry all the time.
She cannot believe that this happened.  Either can I.  I try to tell
her not to worry, but how can she when I am so scared.  I have a
hard time showing my emotions, but that don't mean I don't care
what happened.

I know you believe I did this, but I didn't.

I plead, I beg, please, don't take my life.

### 3. Allocution

**{¶ 245}** Before final sentencing, Pickens continued to maintain his innocence of the murders, stating:

Like the family they might think I did this, people might think I did
it, but I didn't do this.  I had no reason to, nobody to harm, not the
babies or Noelle Washington.  I didn't have no reason to harm
none of them.  I am innocent.  I did not do this.

**{¶ 246}** Under the trial court's questioning, Pickens provided further information about his background.  Pickens was 19 years old when these offenses occurred.  Pickens attended high school to the 12th grade but did not graduate.  Later, he received his GED from Cincinnati State.  Pickens has three younger brothers.  Pickens stated that he does not have any children, even though he had previously stated that he did.

**{¶ 247}** Pickens spoke of his work history.  In 2008, Pickens worked at the Family Dollar store for four months.  For about a month in 2009, he sorted mail at the post office.  Pickens said that he quit because "I couldn't stand up the whole shift.  They wanted me to stand up eight hours sorting mail.  I couldn't."

Pickens then had a temporary job at Today's Staffing where he worked 30 hours a week. Pickens worked there until he was arrested.

*C. Sentence evaluation*

**{¶ 248}** Nothing in the nature and circumstances of the offenses is mitigating. Pickens murdered Noelle to keep her from presenting evidence that he had raped her. Pickens also murdered Anthony Jones III, Noelle's nine-month old son, and three-year-old Sha'railyn Wright. These are horrific crimes that lack any mitigating features.

**{¶ 249}** Pickens's history and background provide little mitigating value. He was raised by a loving mother. Although he did not finish high school, Pickens received his GED and was employed.

**{¶ 250}** The statutory mitigating factors under R.C. 2929.04(B) include R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(3) (mental disease or defect); (B)(4) (youth of the offender); (B)(5) (lack of a significant history of prior criminal convictions and delinquency adjudications); (B)(6) (accomplice only); and (B)(7) (any other relevant factors). The factors under (B)(1), (B)(2), (B)(3), and (B)(6) do not appear to be applicable.

**{¶ 251}** Pickens presented no evidence of his criminal record and did not argue (B)(5) to the judge or jury. The parties stipulated that Pickens had two separate juvenile adjudications for possession of drugs underlying the weapons-under-disability charges in Counts Five and Six. In the sentencing opinion, the trial court stated, "The parties agreed that as a juvenile the defendant was twice sent to the Department of Youth Services for incarceration. The parties also agreed that, as an adult, the defendant has one prior misdemeanor conviction for Unauthorized Use of Property. The Court gave the defendant's lack of a significant prior adult history of criminal convictions some weight even though he had been an adult only for a short time on June 1, 2009."

{¶ 252} Pickens argues that his youth is a mitigating factor that raises serious doubt about the appropriateness of the death penalty. Pickens was 19 at the time of the offenses. We give significant weight to Pickens's youth pursuant to R.C. 2929.04(B)(4). We have upheld the death penalty in cases in which the defendant committed aggravated murder at Pickens's age or younger. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 337 (age 19); *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 203 (age 18); *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 149 (age 18); and *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 98 (age 18).

{¶ 253} Pickens argues that this court should consider Griffin's testimony that she loves him and that she asked the court to spare his life. We give weight to the love and support that he shares with his mother as a (B)(7) factor. *See Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 327. We also give weight under (B)(7) to his employment history and the fact that he earned his GED.

{¶ 254} Pickens raised residual doubt as a mitigating factor during mitigation. The evidence established beyond a reasonable doubt, however, that Pickens murdered Noelle, Anthony, and Sha'railyn. *More than that, the evidence established that Pickens murdered Noelle, Anthony, and Sha'railyn beyond even a residual doubt, which has been described as a "lingering uncertainty about facts, a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.' " Franklin v. Lynaugh, 487 U.S. 164, 188, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring in judgment).* Thus, we reject residual doubt as a mitigating factor.

{¶ 255} In his unsworn statement, Pickens expressed his sorrow for the deaths of Noelle and the two children. During his unsworn statement and allocution, Pickens maintained his innocence, thus denying responsibility for the

murders. Pickens's denials negate the mitigating weight that we might otherwise give to his expressions of sorrow. *See Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, at ¶ 282; *Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 205.

{¶ 256} Upon independent weighing, we find that the aggravating circumstances as to each count outweigh the mitigating factors beyond a reasonable doubt. With respect to Noelle's murder, the course-of-conduct and the escaping-detection specifications strongly outweigh the mitigating factors. The two specifications that apply to Sha'railyn's and Anthony's murders—course of conduct and child murder—overwhelm the mitigating factors. In particular, the R.C. 2929.04(A)(9) specification is entitled to great weight because it involves the murder of young and vulnerable victims. *See Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 282.

{¶ 257} We conclude that the death penalty is appropriate and proportionate when compared to death sentences approved in similar cases. We have previously upheld death sentences for a course of conduct under R.C. 2929.04(A)(5). *See, e.g., Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 329; *Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 284; and *Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, at ¶ 182. We have upheld the death penalty for other child murders under R.C. 2929.04(A)(9). *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 241; *Powell* at ¶ 284; and *Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 206. We have upheld the death penalty for the escaping-detection specification under R.C. 2929.04(A)(3). *See Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, at ¶ 212; *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 148; and *Wilson,* 74 Ohio St.3d at 401, 659 N.E.2d 292.

## V. Conclusion

{¶ 258} We affirm the judgments of conviction and sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL, LANZINGER, KENNEDY, and FRENCH, JJ., concur.

O'NEILL, J., concurs as to the finding of guilt but dissents as to the sentence of death for the reasons expressed in *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164 (O'NEILL, J., dissenting).

_____

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Philip R. Cummings, Assistant Prosecuting Attorney, for appellee.

Daniel F. Burke Jr. and Roger W. Kirk, for appellant.

_____