[Cite as *State v. Hinkston*, 2015-Ohio-3851.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-140448 |
| | | C-140449 |
| Plaintiff-Appellee, | : | TRIAL NOS. B-0602782-A |
| | | B-1305266 |
| vs. | : | |
| | | *O P I N I O N.* |
| MARK HINKSTON, | : | |
| Defendant-Appellant. | : | |

Criminal Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: September 23, 2015

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Melynda J. Machol*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Marguerite Slagle*, Assistant Public Defender, for Defendant-Appellant.

Please note: this case has been removed from the accelerated calendar.

**DEWINE, Judge.**

{¶1}    Mark Hinkston was convicted of felonious assault with a gun specification, having a weapon while under disability, trafficking in cocaine and trafficking in heroin.  In this appeal, he argues that the state failed to prove venue for the drug counts, that the court committed evidentiary errors, that he was prejudiced by prosecutorial misconduct and that he was deprived of the effective assistance of counsel. We affirm the judgments of the trial court.

## I.  Background

{¶2}    In the early morning hours of August 20, 2013, Malcolm Graham, Carley Moore and Mariah Gibson were sitting outside Moore's apartment watching videos on their cell phones.   A man with a "Rasta hat" approached and shot Graham twice.  Mr. Graham ran to a nearby house, and the homeowners called 911.

{¶3}    Several days later, Mr. Graham was in a car with his mother when he spotted the person he believed had shot him.  Because Mr. Graham was not certain the man was the shooter, he did not contact the police.  On August 27, Graham's mother saw the same man and called the police.   Police officers, including Detective Mark Longworth, responded and stopped the man, who was identified as Hinkston.  Detective Longworth searched Hinkston and found cocaine, heroin and a cell phone in his pocket.

{¶4}    Following Hinkston's arrest, police executed a warrant at his residence and recovered a hat that matched the description given by Graham and Moore.  Mr. Hinkston denied that the hat belonged to him, but DNA recovered from the hat matched his own.  Mr. Graham and Ms. Moore identified Hinkston in a photograph array presented by police officers.

{¶5}    At trial, Mr. Graham and Ms. Moore again identified Hinkston as the person that shot Graham.  Paula Papke, records custodian for Cincinnati Bell, testified about records related to the cell phone found on Hinkston.  She explained that the cell phone had a unique number belonging to it (an "IMEI number") and that the SIM card found in the phone had a distinct number.  With these identifiers, Ms. Papke was able to connect text messages to the phone.  Additionally, Ms. Papke provided the locations of cell phone towers that were pinged by the cell phone.  The records indicated that calls from the cell phone during the late hours of August 19 and the early morning hours of August 20 pinged on a cell phone tower near the site of Graham's shooting.

{¶6}    Detective Joseph Coombs led the investigation of Graham's shooting and the subsequent stop of Hinkston.  He testified that as a drug investigator he was familiar with the terms used in the text messages.  For example, on August 19, the day before Graham was shot, the cell phone received a messaged that said, "Still waiting on the white boy to see whats up wit [sic] that banger too."  Detective Coombs explained "banger" was another word for a gun.  The next message sent from the phone was "It's cool we still go'n hit a lick," which Detective Coombs advised usually meant "doing a robbery, doing a shooting, it could mean any kind of criminal involvement."  Other messages referenced drugs.  In the early morning hours of August 27, the cell phone received a message asking "Can you hook a 20 up?"  According to Detective Coombs, that message was a request for a $20 piece of rock cocaine or heroin.  Later requests for "hard," "pup," and "zannies" were interpreted by Detective Coombs to mean crack cocaine, heroin and Xanax, respectively.

{¶7}    In his defense, Mr. Hinkston called Melissa Berry, a forensic psychologist, to testify about research that called into question the trustworthiness of eyewitness identifications and the reliability of police photograph lineup procedures.

{¶8} At the conclusion of the trial, the jury found Hinkston guilty as charged, and the court sentenced him accordingly.

## II. Venue

{¶9} In his first assignment of error, Mr. Hinkston asserts that the trial court erred when it denied his Crim.R. 29 motion for an acquittal with respect to the drug charges. He contends that the state failed to prove venue for the offenses.

{¶10} "[V]enue must be proved beyond a reasonable doubt in a criminal case." *State v. Gardner*, 42 Ohio App.3d 157, 536 N.E.2d 1187 (1st Dist.1987). Mr. Hinkston did not raise the issue of venue in the trial court, but the failure to prove venue is plain error. *Id.* at 158. *See* Crim.R. 52(B).

{¶11} The simplest way to establish venue is to ask the question directly, as the state did during its direct examination about the shooting—"Is that in Hamilton County?" The state did not ask the same question when examining witnesses about the stop that led to the drug charges. Absent direct evidence, venue can be established "by the evidence as a whole or by circumstantial evidence." *State v. Tapke*, 1st Dist. Hamilton No. C-060494, 2007-Ohio-5124, ¶ 59. Mr. Hinkston maintains that the circumstantial evidence did not establish that the offenses occurred in Hamilton County.

{¶12} Mr. Hinkston argues that this case is similar to *State v. Sullivan*, 1st Dist. Hamilton Nos. C-130628 and C-130629, 2014-Ohio-3112, in which this court reversed convictions for failure to stop after an accident and improper backing because the state had not proved venue. In that case, we noted that certain locations were mentioned, but that the state had not elicited testimony identifying the city, county or state of the locations. Further, "[a]t trial, the words 'Hamilton County,' 'Cincinnati,' or even 'Ohio' were never mentioned." *Id.* at ¶ 10.

4

{¶13} As in *Sullivan*, the location of where Hinkston was stopped with drugs—Glenway Avenue—was mentioned but never placed in Cincinnati or Hamilton County. Nonetheless, there was other testimony from which the jury could have found that the trafficking occurred in Cincinnati. Detective Longworth testified that he worked in "District 3 Investigative Unit." Although he never said he was a Cincinnati police officer, he did state that he was Detective Coombs's partner. Detective Coombs identified himself as a Cincinnati police officer working in District 3 Investigative Unit. Further, the notification-of-rights form that Hinkston signed after he was arrested was labeled "Cincinnati Police Department Notification of Rights." Finally, there was testimony that the drugs found in Hinkston's pocket were analyzed by Tracy Sundermeier of the Hamilton County Crime Laboratory. We conclude that there was sufficient evidence from which the jury could determine that the drug offenses happened in Hamilton County. The first assignment of error is overruled.

### III. No Error Admitting Text Messages

{¶14} In his second assignment of error, Mr. Hinkston asserts that the court erred when it admitted text messages from the cell phone found on him when he was arrested. He argues that the messages were not properly authenticated, that they were inadmissible hearsay and that their admission violated his rights under the Confrontation Clauses of the United States and Ohio Constitutions.

{¶15} Mr. Hinkston contends that Papke's testimony was not sufficient to authenticate the text messages. He seems to confuse the requirement of authentication with the weight to be given the evidence. Papke's testimony connected the phone's IMEI number and the SIM number with the text messages later explained by Detective

Coombs. That testimony authenticated the records: it showed that the records were from the cell phone taken from Hinkston. *See* Evid.R. 901(A).

{¶16} Mr. Hinkston further argues that there was not sufficient evidence to connect him to the text messages, because the cell phone was registered to Dawn Key, Hinkston's girlfriend, and because Papke could not determine who had actually sent the messages. Ms. Key gave Detective Coombs a different cell number for her contact information. Detective Coombs testified about one message received by the phone from Key's number in which she complained, "I am getting real sick of going to voicemail, Mark." This evidence, along with the phone having been found in Hinkston's possession, was sufficient for the jury to determine that the text messages had been sent and received by Hinkston.

{¶17} Mr. Hinkston also challenges the admissibility of the text messages. The record of the cell phone account was admissible as a business record. *See* Evid.R. 803(6). But the messages themselves are "hearsay within hearsay" and must be independently admissible. *See* Evid.R. 805. Many of the messages discussed at trial were allegedly sent by Hinkston, and so were admissible as nonhearsay admissions by a party-opponent. *See* Evid.R. 801(D)(2). Messages referencing drugs were admitted not for the truth of the matter asserted, but to give context to Hinkston's responses. As such, they were not hearsay. *See* Evid.R. 801(C). Other messages in the records presented to the jury were arguably inadmissible hearsay, but their admission was harmless in light of the overwhelming evidence of Hinkston's guilt.

{¶18} Within this assignment of error, Mr. Hinkston maintains that the admission of the text messages violated his Confrontation-Clause rights. But his confrontation rights were not implicated, much less violated, by the admission of the messages.

{¶19} The Confrontation Clause of the Sixth Amendment protects a defendant's right to be "confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2007), the United States Supreme Court held that the clause prohibits the admission of testimonial statements of a witness who does not testify at trial, unless the witness is unavailable for trial and the defendant has had a prior opportunity to cross-examine her. In later cases, the court pinpointed what qualified as "testimonial statements." Thus, statements were testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The court reserved the question of what constituted an interrogation. *Id.* at 823, fn. 2. "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " *Ohio v. Clark*, __ U.S. __, 135 S.Ct. 2173, 2180, 192 L.Ed.2d 306 (2015), quoting *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). Here, the purpose of the text messages was not to "create an out-of-court substitute for trial testimony." It's a safe bet that the people involved in the text conversations about drugs and guns did not intend for the messages to become any part of a criminal trial. Because the messages were not testimonial in nature, Mr. Hinkston's confrontation rights were not violated. The second assignment of error is overruled.

### IV. Taped Police Statement was Properly Excluded as Hearsay

{¶20}  Hinkston's third assignment of error is that the court improperly excluded the recording of his interview with Detective Coombs.  He argues that his out-of-court statement was admissible as a public report under Evid.R. 803(8).

{¶21}  Evid.R. 803(8) provides an exception to the hearsay rule for "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law[.]"  Excluded from the exception are "matters observed by police officers * * * unless offered by defendant."  Evid.R. 803(8).  Although the recording was offered by the defendant in this case, it does not fall within this exception because it was not a report of Detective Coombs's observations.  *See State v. Gau*, 11th Dist. Lake No. 2000-L-109, 2002-Ohio-4216, ¶ 19-21.  The court properly excluded the evidence.  The third assignment of error is overruled.

### IV. No Prosecutorial Misconduct

{¶22}  The fourth assignment of error is that the trial court erred when it allowed the state to engage in prosecutorial misconduct during its closing argument. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant."  *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). During the trial, Mr. Hinkston objected to only one of the comments that he maintains were improper.  For the remainder of the comments, we review for plain error.  *See* Crim.R. 52(B).

{¶23}  We consider first the comment to which Hinkston objected. Mr. Hinkston argues that the assistant prosecuting attorney overstepped the bounds of fair

comment on the evidence when he suggested that the cell phone found in Hinkston's possession placed him at the scene of the shooting. But Ms. Papke testified that, in the late hours of August 19 and the early hours of August 20, the cell phone pinged on towers located near the area where Graham was shot. The assistant prosecuting attorney's argument was not improper in light of Papke's testimony.

{¶24} Mr. Hinkston did not object to the remaining comments he now challenges. Thus, he "must establish both that misconduct occurred and that but for the misconduct, the outcome of the trial clearly would have been otherwise." *See State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.2d 1023, ¶ 109.

{¶25} Mr. Hinkston protests that, during rebuttal, the assistant prosecuting attorney mischaracterized defense counsel's closing argument. We are not convinced that the assistant prosecuting attorney's statements were improper in light of defense counsel's argument. During his argument, defense counsel reminded the jury that the police officers had not recorded Moore's statement describing the shooter. He went on to suggest that the officers had not recorded the statement so that Moore could later change her story at trial. Counsel also argued that police officers regularly lie to the accused to elicit incriminating statements. Faced with defense counsel's charges of trickery and lying on the part of the police officers, the assistant prosecuting attorney responded:

> If you think that we are coming in here and cheating and lying and convincing witnesses to cheat and lie to convict somebody that we don't even know for reasons not even known to anyone, then you should absolutely return a verdict of not guilty. But I will tell you that that is a bunch of BS. We are not cheating and lying.

This rebuttal was fair in light of defense counsel's argument.

{¶26} Mr. Hinkston also insists that the assistant prosecuting attorney improperly stated that Hinkston had sent the text message that said, "Still waiting on the white boy to see what's up wit [sic] that banger too." It's not clear from the transcript that the assistant prosecuting attorney was arguing that the message was sent by Hinkston. Even if his comments are interpreted in this manner, we are unable to say that but for the misstatement, the outcome of the trial would have been different. Detective Coombs testified that message was received, not sent, by the phone used by Hinkston. The next message sent by the phone—"It's cool we still go'n hit a lick"—clearly implicated Hinkston. The fourth assignment of error is overruled.

## V. No Ineffective Assistance of Counsel

{¶27} Hinkston's final assignment of error is that he was denied the effective assistance of counsel. He complains that his counsel failed to object to the text messages as inadmissible hearsay and that counsel should have objected to the assistant prosecuting attorney's improper arguments during closing.

{¶28} To succeed on this claim, Mr. Hinkston must show that his counsel's performance was deficient, and that, absent his counsel's errors, the result of the proceedings would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). Mr. Hinkston has not made such a showing.

{¶29} An objection to the text messages would not have been successful. As discussed, the text messages were admissible nonhearsay statements. The decision not to object during the assistant prosecuting attorney's closing argument was likely a strategic one in light of the latitude given counsel during argument. And even if an objection had been made, we conclude that the result of the proceedings would not have been different. The fifth assignment of error is overruled.

10

**{¶30}** The judgments of the trial court are affirmed.

Judgments affirmed.

**CUNNINGHAM, P.J.,** and **STAUTBERG, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.